UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AJAY GAALLA, *et al*, § | |
| § | |
| Plaintiffs, § | |
| VS. § | CIVIL ACTION NO. V-10-14 |
| § | |
| CITIZENS MEDICAL CENTER, *et al*, § | |
| § | |
| Defendants. § | |

## ORDER

On this day came on to be considered Plaintiffs' Motion to Hold Defendant Citizens Medical Center in Contempt for Violation of the Court's Preliminary Injunction (the "Motion"). (D.E. 115.) For the reasons stated herein, Plaintiffs' Motion is GRANTED.

**I.  Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) with supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law causes of action.

**II.  Factual and Procedural Background**

Plaintiffs Ajay Gaalla, M.D., Harish Chandna, M.D., and Dakshesh Parikh, M.D. filed this action on February 24, 2010. (D.E. 1.) The general factual and procedural background is described in other orders of this Court.

Relevant here, on March 12, 2010, the Court entered a Preliminary Injunction Order, which reads in relevant part:

> "Defendants and their agents, servants, representatives and employees, and all those acting in aid of and in concert with them are immediately enjoined and prevented from implementing Action 1 of the Board Resolution, which provides, '[o]nly those physicians who are contractually

committed to the Hospital to participate in the Hospital's on-call emergency room coverage program shall be permitted to exercise clinical privileges in the cardiology department or as part of the Hospital's heart program.'" (D.E. 29.)

On October 26, 2010, Plaintiffs filed the Motion presently at issue. (D.E. 115.) Plaintiffs claim that Citizens Medical Center ("CMC") has violated the Preliminary Injunction Order by (1) misinforming patients that Plaintiffs were no longer working at CMC and (2) refusing to notify or consult Plaintiffs when their patients were admitted to CMC and specifically requested Plaintiffs.

Plaintiffs request the Court to issue an order holding CMC in contempt and sanctioning CMC for damages to Plaintiffs, including loss of patient goodwill, injury to their reputation, lost earnings, loss of business, and attorney's fees. Plaintiffs suggest that criminal contempt proceedings may also be appropriate. The Court held a hearing in this matter on December 16, 2010.

### III.    Discussion

#### A.    Applicable Law

The elements of civil contempt are "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) the that respondent failed to comply with the court's order." In re Bradley, 588 F.3d 254, 264 (5th Cir. 2009). "The power to punish for contempt is an inherent power of the federal courts and . . . it includes the power to punish violations of their own orders." Id. "Contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act." Martin v. Trinity Industries, Inc., 959 F.2d 45, 47 (5th Cir. 1992).

If the Court finds a violation of its orders, it can issue a civil contempt sanction. "Several factors are to be considered in the imposition of a civil contempt sanction: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction, (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order." Lamar Financial Corp. v. Adams, 918 F.2d 564, 567 (5th Cir. 1990) (citing United States v. United Mine Workers, 330 U.S. 258 (1947)).

    B.    Application

        1.    Arguments

In support of their Motion, Plaintiffs provide statements from sixteen patients (or family members) who, they claim, were denied the right to see Plaintiffs (the physician of their choice) after the Court entered its Preliminary Injunction Order. The patient reports generally describe the difficulties they encountered in trying to see Plaintiffs at CMC after they specifically requested that Plaintiffs be called. For example, CMC staff would say that Plaintiffs no longer worked at CMC, that they were unable to contact Plaintiffs, or in one case that CMC was simply "not happy about" Dr. Parikh's continued presence at CMC. (D.E. 115-1 – 115-15.) These reports are based upon visits to CMC ranging from March 17, 2010 to October 2010. At the December 16, 2010 hearing, five individuals, all either patients who presented at CMC or their family members, testified on Plaintiffs' behalf.

Defendant CMC strongly disputes Plaintiffs' assertion that its alleged conduct violates the Preliminary Injunction Order. Defendant states that Plaintiffs' Motion fails to make even a prima facie showing of contempt because (1) CMC's cardiology

department is not closed (thus constituting full compliance with the preliminary injunction); (2) the injunction order does not mandate that Plaintiffs be called in all circumstances; (3) Plaintiffs did not plead or prove at the injunction hearing any violation of due process or equal protection related to being deprived of calls from the ER; (4) Plaintiffs' interpretation of the injunction might violate Emergency Medical Treatment and Active Labor Act ("EMTALA"); (5) CMC's ER physicians typically call Plaintiffs when patients request this; and (6) the 16 patients at issue were treated appropriately, including consultation with or referral to Plaintiffs as appropriate based upon clinical presentation.

### 2. Analysis

At issue is whether CMC failed to comply with the Court's Preliminary Injunction Order. As noted above, the Order prohibits CMC and its agents from implementing Action 1 of the relevant Board Resolution, which provides, "[o]nly those physicians who are contractually committed to the Hospital to participate in the Hospital's on-call emergency room coverage program shall be permitted to exercise clinical privileges in the cardiology department or as part of the Hospital's heart program."

As an initial matter, the first two elements of civil contempt are easily satisfied. In re Bradley, 588 F.3d at 264. First, a court order was in effect, as this Court entered its preliminary injunction Order on March 12, 2010. (D.E. 29.) Second, the preliminary injunction Order clearly "required certain conduct" by CMC, namely, it prevented CMC from "implementing Action 1 of the Board Resolution." (D.E. 29.) In this context, the term "implementing" is generally defined as "to put into effect," and thus contemplates more than actual, formal passage of the Board Resolution. Webster's II New Riverside

University Dictionary (1988).  Not only was CMC prevented from passing Action 1 of the Board Resolution, but taking other actions short of passage that would put into effect the practices described in Action 1.  This would necessarily include falsely informing patients that Drs. Gaalla, Chandna, and Parikh were no longer available at CMC, or otherwise refusing to contact them after a patient requested that they be called.

The Court finds disingenuous CMC's argument that the Court's Preliminary Injunction Order does not reach the conduct at issue in this contempt motion.  As an initial matter, the Court noted its concerns on this issue at the March 11, 2010 preliminary injunction hearing.  At the hearing, the Court stated that "these cardiologists **are not allowed to even be notified when their patients are admitted on the cardiac services at this hospital**. **The patients are denied the use of their physician with knowledge and a history of their condition, and I think that's very dangerous for the public**."  (D.E. 37 at 378) (emphasis added).).  Moreover, the March 22, 2010 e-mail from David Brown to CMC staff addressing the Preliminary Injunction Order (discussed in further detail below) specifically explained that "hospital personnel should **honor the request of patients who present to the hospital request to be seen by PCG [Plaintiffs]**, to the extent that such a request is consistent with hospital and medical staff policies."  (CMC Exh. 18 (emphasis added).)  This demonstrates that CMC did in fact understand this Court's Preliminary Injunction Order to require CMC staff to contact Plaintiffs when their patients presented at CMC and requested that Plaintiffs be called.  At the very least, the Preliminary Injunction Order prevented CMC staff from falsely informing patients that Plaintiffs no longer worked at CMC.

The Court now turns to the third element, "that respondent failed to comply with the court's order." <u>In re Bradley</u>, 588 F.3d at 264.   Upon review of the evidence before the Court, it is clear that CMC failed to comply with this Court's Preliminary Injunction Order.

CMC's attitude of non-compliance with the orders of this Court began at the very start of this case.  On February 25, 2010, the day after the Court issued its Temporary Restraining Order in this action, CMC Administrator David Brown sent the following e-mail to "Leadership" at CMC, which was then distributed to other CMC staff:

> Subject: They're Baaaaaack – temporarily!
>
> Doctors Parikh, Chandna, and Galla [sic] have filed suit against the Board, Dr. Campbell, and me in Corpus Christi, requesting a Temporary Restraining Order.  As these things go, the other side has the advantage of surprise and presents a prepared argument to the judge, colored to show how badly they have been abused.  Our side does not have the ability to defend since we don't know the charges.  So it goes in the legal system.
>
> The judge has scheduled us for a hearing on March 10.  Meanwhile, the judge orders that we have to let them practice.  They can admit, attend, and consult, for now.
>
> This might seem awkward but don't let it bother you.  We know what and who they are.

Pls. Exh. 1; <u>see also</u> CMC Exh. 17 (Doctor's Page, Memo from David Brown: "Doctor Parikh, Chandna, and Gaalla have filed suit for a Temporary Restraining Order.  How this works is that they present the judge with a long and detailed argument, and we just get to be there.  The judge, as they always do, grants the Temporary Restraining Order and schedules a hearing, in this case set for March 10, 2010.  In the meanwhile, the judge orders that we let them practice.  They can admit, attend, and consult, for now.").  The February 25, 2010 e-mail message was subsequently forwarded from Mr. Brown to Dr.

Stone, with a message stating: "PCG still does not take call and we don't need to call." Id. While this e-mail was sent prior to the Court's March 12, 2010 Preliminary Injunction Order (D.E. 29), it nevertheless demonstrates the context in which this Court's Order was received. The subject line cavalierly referred to Plaintiffs' exercise of privileges at the hospital, portrayed CMC as the innocent victim of a legal ambush, and indeed demonstrated disrespect for the "legal system" as a whole.

After the Court entered its Preliminary Injunction Order, Mr. Brown sent another e-mail to staff. This e-mail, dated March 22, 2010, while more serious than the February 25, 2010 e-mail, contains only a brief reference to this Court's Order, and continues to reinforce negative attitudes towards Plaintiffs. The Court also notes that this e-mail was sent *ten days* after issuance of the Preliminary Injunction Order, demonstrating that Mr. Brown did not find it necessary to immediately inform his staff of this important legal development. The e-mail reads as follows:

> Subject: Clarification regarding Parikh, Chandna, Galla
>
> Please understand that since February 25, 2010, Citizens Medical Center must allow Parikh, Chandna, and Galla [sic] to exercise their staff privileges. This is until further notice as the court's decision is under appeal. PCG may fully exercise their privileges, including admitting, consulting, and performing procedures as permitted by the hospital and medical staff bylaws, rules, regulations, policies, and procedures.
>
> Further, **hospital personnel should honor the request of patients who present to the hospital request to be seen by PCG, to the extent that such a request is consistent with hospital and medical staff policies.**
>
> Thank you for your patience in this matter. You should contact me with any questions, and contact me promptly regarding **further threats or displays of disruptive conduct** on the part of Parikh, Chandna, and Galla, to include derogatory comments about this hospital, its employees, or its medical staff. (CMC Exh. 18 (emphasis added).)

These e-mails demonstrate that CMC's contemptuous attitude towards this Court's Preliminary Injunction Order began early, and started at the top, with Administrator Brown himself. CMC inadequately informed its staff about the seriousness of the injunction and the breadth of its effect. This failure is clear from the testimony of the Plaintiffs' witness at the contempt hearing.

At the December 16, 2010 hearing, Plaintiff presented the testimony of five witnesses who were either patients at CMC or their family members. As an initial matter, the Court finds the testimony of all Plaintiffs' witnesses to be credible. These witnesses, some of whom were in ill health, traveled from Victoria to Corpus Christi just for the contempt hearing, and have no possible reason to lie.

The first witness (B.L.) testified that he came to CMC on March 17, 2010, complaining of shortness of breath. The E.R. doctor concluded that the shortness of breath was related the patient's prior heart problems. In the course of gathering his medical history, the patient was asked if he had a cardiologist, and B.L. stated that his cardiologist was Dr. Gaalla. The nurse informed him that Dr. Gaalla no longer worked at CMC, and only at that time did B.L. agree to see the cardiologist on call, Dr. Oakley. B.L. testified that he asked Dr. Oakley about Dr. Gaalla, and was again told that Dr. Gaalla was not at CMC. Thereafter, CMC staff began to run a series of tests of B.L., including stress tests and sonograms. Only afterwards did B.L. find out that Dr. Gaalla was still in Victoria, Texas, after talking with other patients at a Veterans Affairs clinic. Upon discovering this, B.L. stated that he felt as if he had been "lied to."

The second witness (I.I.) testified that he came to CMC on July 3, 2010, around 4:50 pm, complaining of chest pains. The patient told ER doctor Thamwiwat and staff

that his cardiologist was Dr. Parikh, and ER staff said that they tried to contact Dr. Parikh, but were unable to get a hold of him. The patient was then seen by another cardiologist. When the patient saw Dr. Parikh a few weeks later and told him that he had been at CMC, Dr. Parikh appeared surprised that no one had called him. According to a patient log, it appears that a call may have been placed to Dr. Parikh at approximately 6:04 pm on July 3, 2010, although the log states that this call was "received" by a "Michelle McAdams," who was apparently an employee of CMC. Only upon discharge was the patient referred to Dr. Parikh.

The third witness (M. G.) testified that her husband C. G. visited CMC in May 2010. He had a significant cardiac history, having undergone bypass surgery and implantation of two stents. The patient, along with his wife, was kept at CMC overnight for observation. While at the hospital, the witness testified that she asked for Dr. Parikh, her husband's cardiologist, to be called. Although CMC staff said they had contacted Dr. Parikh, the witness could not confirm whether this was done. Dr. Stone, a CMC ER physician then ordered and performed a nuclear stress test upon the patient, despite his wife's protestations that he not have one in light of his recent heart surgery. The witness testified that CMC staff had informed her that they had reached Dr. Parikh, who had ordered the stress test. Nevertheless, when the patient visited Dr. Parikh two weeks after his visit to CMC, Parikh appeared surprised that the patient had been to CMC, and that a stress test had been ordered.

The fourth witness (J.C.) testified that when she went to CMC on May 17, 2010, she told ER staff that her doctor was Dr. Gaalla. She asked to see Dr. Gaalla twice, once in the ER, and then once she reached the cardiac floor of the hospital. A nurse told her

that Dr. Gaalla was "no longer with the hospital," and that she would have to see someone else. J.C. then agreed to see a different doctor, and she only saw Dr. Gaalla after she was released from CMC, in a subsequent appointment (that she made herself) on May 25, 2010. The patient testified that she was "in shock" when told Dr. Gaalla no longer worked at CMC, and could not figure out why he was no longer there.

Finally, the fifth witness (P.D.), testified that her mother went to CMC on October 11, 2010, for a heart related condition. The witness stayed with her mother during the majority of her time at CMC. The witness told ER staff on several occasions that Dr. Gaalla was her mother's doctor, but they responded that the ER physician (Dr. Wheeler) would have to determine whether it was appropriate to contact Dr. Gaalla. The witness testified that she asked a nurse to contact Dr. Gaalla every evening that her mother was in the hospital. At no time, however, was Dr. Gaalla called. Only after the patient's discharge from CMC was an appointment made with Dr. Gaalla for October 22, 2010. The patient in fact had to visit Dr. Gaalla earlier than the scheduled visit due to continuing health problems.

Plaintiffs Chandna, Gaalla, and Parikh also testified at the hearing. While they agreed that they had not been entirely prevented from practicing at CMC since March 12, 2010, they expressed concern that they were not called when their patients presented at CMC. Parikh testified that his ability to see patient and offer treatments was an integral part of his right to practice at CMC.

Defendant CMC presented several witnesses in its defense, including CMC E.R. physicians Dr. Stone, Dr. Thamwiwat, Dr. Wheeler, and cardiologist Dr. Oakley. In contrast to the witnesses presented by Plaintiffs, the Court finds the testimony of these

physicians not to be credible.  As an initial matter, each has some interest in preventing their employer from becoming embroiled in further legal trouble.  Second, in at least some cases it became clear to the Court that the physicians had an incentive under the hospital's bonus structure not to call Plaintiffs and rather increase the number of tests performed at CMC, primarily for Medicare billing purposes.  Third, some of these witnesses' testimony contradicted their own deposition testimony.  For example, Dr. Stone testified during his deposition that when a patient presents at CMC with a STEMI, the patients' cardiologist would not be called, and rather protocol would be to contact the interventionalist on call.  During his cross-examination, however, Dr. Stone testified if a "patient specifically requests that we call [his or her cardiologist] then we call."  Dr. Stone stated that it had been "several months" since he last called one of the Plaintiffs when their patients presented at CMC with a STEMI.  Finally, the Court notes that some of the testimony offered at the hearing by CMC's witnesses simply made no sense.  For example, Dr. Oakley claimed that patient B.L. never informed him that his present cardiologist was Dr. Gaalla, despite providing a detailed cardiac history dating back to 1994, and covering procedures in Austin and San Antonio.  The Court simply does not believe that a patient would provide such a detailed medical history (some of which the patient states was incorrectly recorded in his file) and entirely neglect to mention the name of his present cardiologist.

After considering all of the evidence, the Court concludes that CMC violated the Preliminary Injunction Order.  Patients B.L. and J.C. specifically testified that when they requested that Dr. Gaalla be called, they were told that he was no longer with CMC.  This clearly amounts to an implementation of Action 1 of the Board Resolution, effectively

excluding Plaintiffs from practicing at CMC.  With respect to the other patients who testified (I.I., M.G., and P.D.), there is considerable doubt as to whether Plaintiffs were ever called, despite the patients' requests to do so.  Finally, the Court notes that CMC has done nothing to dispute the reports of the other patients who presented at CMC and were unable to see Drs. Gaalla, Chandna, and Parikh.  (D.E. 115-1 – 115-15.)

In light of the foregoing, the Court holds CMC in contempt of Court for violation of this Court's March 12, 2010 Preliminary Injunction Order.  CMC is hereby ordered to pay Plaintiffs' attorneys' fees in the amount of $14,539.40 by noon on December 23, 2010.  This amount shall be jointly payable to Plaintiffs.

## IV.     Conclusion

For the reasons stated above, the Court GRANTS Plaintiffs' Motion to Hold Defendant Citizens Medical Center in Contempt for Violation of the Court's Preliminary Injunction.  (D.E. 115.)  The Court orders CMC to pay Plaintiffs' attorneys' fees in the amount of $14,539.40 by noon on December 23, 2010, made jointly payable to Plaintiffs.

SIGNED and ORDERED this 17th day of December, 2010.

_____
Janis Graham Jack
United States District Judge