UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

AJAY GAALLA, *et al*,                          §
                                                §
          Plaintiffs,                           §
VS.                                             §          CIVIL ACTION NO. V-10-14
                                                §
CITIZENS MEDICAL CENTER, *et al*,               §
                                                §
          Defendants.                           §

## ORDER

On this day came on to be considered: (1) Defendant Citizens Medical Center's Motion for Summary Judgment (D.E. 133); (2) Defendant Board Members' Motion for Summary Judgment (D.E. 134); (3) Defendant David P. Brown's Motion for Summary Judgment (D.E. 135); and (4) Defendant William Todd Campbell, Jr., M.D.'s Motion for Summary Judgment Based on Qualified Immunity (D.E. 120).

For the reasons stated herein, the Court GRANTS IN PART AND DENIES IN PART (1) Defendant Citizens Medical Center's Motion for Summary Judgment (D.E. 133); (2) Defendant Board Members' Motion for Summary Judgment (D.E. 134); (3) Defendant David P. Brown's Motion for Summary Judgment (D.E. 135); and (4) Defendant William Todd Campbell, Jr., M.D.'s Motion for Summary Judgment Based on Qualified Immunity (D.E. 120).

**I.      Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) with supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law causes of action.

## II.     Factual Background

Plaintiffs are licensed cardiologists of Indian origin who have privileges at Citizen's Medical Center ("CMC") in Victoria, Texas.  Plaintiffs are all board certified in Interventional Cardiology and Cardiovascular Diseases.  Plaintiffs Parikh and Gaalla have been licensed in Texas since 1993, Plaintiff Chandna since 1998.  Defendant CMC is a public hospital owned and operated by the County of Victoria.  (D.E. 91 at 2-3.)

Before 2007, Plaintiffs state that they regularly admitted patients at CMC and exercised their privileges at the hospital without a problem.  This, however, began to change in 2007, when Plaintiffs allege that "CMC's misconduct against [them] began to manifest."   The Second Amended Complaint details several instances of such "misconduct."

As a first example, Plaintiffs allege that early in 2007, despite being board certified with implantable cardioverter defibrillator ("ICD") privileges at DeTar Hospital (also in Victoria), CMC denied ICD privileges to Plaintiffs at CMC but granted new privileges to less qualified physicians.  Second, Plaintiffs allege that CMC removed Plaintiff Dr. Chandna from the peer review committee for allegedly missing too many meetings of that committee, although he claims to have attended more meetings than any other member besides the chairman.  As a third example, Plaintiffs allege that CMC caused Plaintiff Chandna to resign as director of the cardiac catheterization laboratory at CMC.  (D.E. 91 at 4.)

Plaintiffs claim that the basis for these actions was discrimination on the basis of their Indian origin.  Plaintiffs allege that the discriminatory attitude "continues to permeate throughout CMC," and point to several internal correspondence referring to

Plaintiffs collectively as "the Indians" in a derogatory manner or making other discriminatory comments.  (D.E. 91 at 4.)

Plaintiff state that, in 2007 and 2008, CMC began the process of "remov[ing]" them from the hospital by entering into contacts with a competing group of non-Indian cardiologists, Drs. Campbell, Krueger, Tillman, Oakley, and Junor.  Plaintiffs state that these cardiologists were essentially in an employer-employee relationship with these physicians, illegal under Texas law.  (D.E. 91 at 5.)[1]  Although similar employment offers were made to Plaintiffs, they characterize the offers as a "farce," merely an afterthought to "convey an appearance of fairness."  Plaintiffs were also removed from the Chest Pain Center committee, while other CMC cardiologists continued to be members.  (D.E. 91 at 5.)

CMC allegedly furthered its attempt to remove Physicians from CMC by amending its protocols to instruct staff not to call Plaintiffs when their patients presented to CMC's Chest Pain Center, even if they specifically requested Plaintiffs. (See D.E. 153-2 at 23 (Dr. Allen Depo.).)  When surgery was necessary, the patient was referred to CMC's exclusive cardiac surgeon, Dr. Yusuke Yahagi.   Plaintiffs allege that the "amended protocol enabled CMC to get rid of the 'middle eastern' Physicians and increase its profits through its illegally employed cardiologists and exclusive cardiac surgeon."  (D.E. 91 at 6.)  Plaintiffs also contend that CMC would use Plaintiffs' patient

---

[1] The Court has already rejected Plaintiffs' argument that the employment contracts between CMC and Dr. Campbell are illegal under the corporate practice of medicine prohibition.  (D.E. 170.)  The Court understands Plaintiffs' characterization of these other contracts as "illegal" to be based on the same argument (although Plaintiffs do not seek to invalidate these other contracts).  The Court uses the term "illegal" here only to describe Plaintiffs' allegations, and it does not represent the Court's position on this issue.

care concerns as an excuse to initiate peer review proceedings *against* Plaintiffs. (D.E. 91 at 6.)

The alleged animosity between CMC and the Plaintiffs culminated on February 17, 2010, when CMC's lawyer wrote a letter to Plaintiffs advising them that CMC had passed a resolution barring them from practicing at CMC. The letter included an unsigned and undated CMC Board Resolution, which purported to exclude all physicians from the cardiology department who were not contractually committed to participate in CMC's on-call emergency room coverage program, and precluded such physicians from exercising their clinical privileges at CMC. The relevant portion of the Resolution provided:

> "'[o]nly those physicians who are contractually committed to the Hospital to participate in the Hospital's on-call emergency room coverage program shall be permitted to exercise clinical privileges in the cardiology department or as part of the Hospital's heart program.'" (D.E. 131-7)

CMC claimed that passage of the Board Resolution was due to "operational problems." (D.E. 91 at 7.) Plaintiffs state that this is a mere pretense, and rather they were removed for discriminatory purposes, and because they refused to refer patients to CMC's cardiac surgeon, Dr. Yahagi. The Board Resolution was precipitated by letters dated December 16, 2009, sent to Plaintiffs from Donald Day (Chairman of the CMC Board of Directors), in which Plaintiffs' patient referral decisions were questioned, and "economic pressure" was placed upon them to refer patients to Dr. Yahagi. (D.E. 91 at 9-10.) This letter requested a written response on the issue, so that these responses could be taken "into account during [Plaintiffs'] reappointment process." (D.E. 153-65 at 3 ("We are convinced that it is not in the best interests of Citizens Medical Center to have patients at our hospital . . . referred to other physicians at other hospitals when Dr. Yahagi is

4

competent to perform these procedures at Citizens Medical Center.".)  Plaintiffs claim that they often refused to send their cardiac patients to Dr. Yahagi because they believed that it was not in their patients' best interest, in light of Dr. Yahagi's "unusually high mortality rate among heart surgery patients."  (D.E. 91 at 7-8.) Both CMC and Dr. Yahagi were upset by Plaintiffs' refusals.  (D.E. 91 at 8.)  CMC's employed cardiologists, however, continued to refer all patients to Dr. Yahagi.  (D.E. 91 at 8.)

Also on February 17, 2010, Defendant David Brown, CMC's Administrator, informed all CMC medical staff of the Board Resolution, and set a February 24, 2010 deadline for Plaintiffs to cease their cardiology practice and clinical privileges at CMC. (D.E. 91 at 7.)

Plaintiffs contend that, after the proposed Board Resolution, CMC has started to steer Plaintiffs' patients towards CMC's cardiologists, going so far as to not call Plaintiffs when their patients present at CMC.  (D.E. 91 at 11.)  Plaintiffs conclude that, "CMC has treated the Physicians unequally and attempted to unduly pressure the Physicians to make decisions in the best economic interests of CMC, rather than decisions based on the health care needs of their patients.  When the Physicians did not succumb to CMC's pressure, CMC began steering the Physicians' patients to CMC's cardiologists."  (D.E. 91 at 11.)

Displeased with the Board Resolution, Plaintiffs filed suit on February 24, 2010, bringing several causes of action, and seeking injunctive relief and damages.  (D.E. 1 at 12-13.)  On March 12, 2010, the Court held a hearing in which it granted Plaintiffs' request for a preliminary injunction, and prevented CMC from implementing Action 1 of the Board Resolution.  (D.E. 29.)  As part of this Order, the Court found that Plaintiffs

had a substantial likelihood of success only with respect to their claims for substantive due process violations.  (D.E. 29 at 2.)  On April 6, 2010, Plaintiffs filed an Amended Complaint, restating the allegations made in their Original Complaint but altering their causes of action.  Plaintiffs' Second Amended Complaint was filed on August 6, 2010. (D.E. 91.)  Plaintiffs claim that, since the Court's preliminary injunction, CMC has "acted to preclude the Physicians from practicing at CMC."  (D.E. 91 at 8, 12; see also D.E. 171.)

Named as Defendants in the Second Amended Complaint are CMC, David P. Brown ("Brown"), Donald Day, Joe Bland, Andrew Clemmons, M.D., Jennifer Hartman, Paul Holm, Luis Guerra (collectively, the "Board Member Defendants"), and William Todd Campbell, Jr., M.D. ("Campbell").  (D.E. 91.)

Plaintiffs state the following claims in their Second Amended Complaint: (1) violation of substantive and procedural due process, under 42 U.S.C. § 1983, against CMC, Brown, and the Board Member Defendants (by effectively altering or terminating Plaintiffs' privileges at CMC for allegedly improper economic and discriminatory reasons, and denying them procedural protections) (D.E. 91 at 12-15); (2) violation of equal protection rights, under 42 U.S.C. § 1983, against CMC, Brown, and the Board Member Defendants (by allegedly discriminating against Plaintiffs on the basis of race) (D.E. 91 at 15-20); (3) tortious interference with contractual relations against Dr. Campbell (D.E. 91 at 20-22); (4) tortious interference with prospective relations against Dr. Campbell (D.E. 91 at 22-23); (5) defamation against Dr. Campbell  (D.E. 91 at 23-26); and (6) civil conspiracy against all Defendants. (D.E. 91 at 26).  Plaintiff continue to seek  permanent  injunctive  relief,  preventing  CMC  from  implementing  the  Board

Resolution and limiting Plaintiffs' exercise of their hospital privileges to provide care and treatment to their patients at CMC. (D.E. 91 at 26-28.) Plaintiffs also seek compensatory and exemplary damages, along with attorney's fees. (D.E. 91 at 28-29.)

### III.   Procedural Background

CMC, the Board Member Defendants, Defendant David P. Brown and Defendant Dr. William Todd Campbell, Jr., M.D. have filed Motions for Summary Judgment, seeking summary judgment on all claims. (D.E. 120, 133, 134, 135.) Plaintiffs filed Responses on November 24 (D.E. 143) and December 6, 2010 (D.E. 153, 154, 155.)[2] CMC, the Board Member Defendants, and Brown sought leave to file Replies on December 21, 2010. (D.E. 174, 175, 176.) The Court grants leave, and considers the arguments in the Replies. (D.E. 174, 175, 176.)

CMC's Motion addresses all arguments for dismissal with the exception of qualified immunity. The non-CMC Defendants incorporate this Motion by reference, and focus primarily upon issues of qualified and official immunity. Dr. Campbell's Motion focuses on the claims made personally against him, and argues for dismissal on the basis of official immunity. The Court first addresses the arguments raised in CMC's Motion for Summary Judgment before considering qualified and official immunity.

---

[2] Also pending is Plaintiffs' Motion to Strike (D.E. 152). Plaintiffs seek to strike (1) Exhibits K, M (correspondence), (2) Exhibits P, Q, R, S, T, U (various protocols and other documents relating to CMC), (3) Exhibit V (e-mail correspondence), and (5) Exhibit Y (printed copies of website content). Plaintiffs first seek to strike these exhibits due to improper authentication under Federal Rule of Evidence 901. Plaintiff states that Exhibit V is a printed page from a website, but this is in fact an e-mail from David Brown discussing this Court's preliminary injunction order. This e-mail has previously been utilized at hearings without objection. Plaintiffs' arguments with respect to Exhibit Y need not be addressed, as the Court does not rely on this exhibit (a printout from the American Association of Physicians of Indian Origin website). The other exhibits, generally CMC communications and protocols, can be authenticated under Rule 901(b)(1), testimony of a witness with knowledge. Mr. Brown's affidavit discusses the other documents and states that they are "true." (D.E. 131-10.) Mr. Brown, as CMC Administrator, is in a position to testify as to the authenticity of the CMC exhibits at issue. Plaintiffs also move to strike these exhibits on hearsay grounds, Federal Rule of Evidence 801. The Court also denies this request for purposes of this order.

**IV.     Discussion**

     **A.     Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." Rivera, 349 F.3d at 247.  The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment").

Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party.  Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

## B.  Time Barred Claims

The limitations period for claims brought under 42 U.S.C. § 1983 in Texas courts is two years, as is the statutory period for civil conspiracy claims.  See Piotrowski v. City of Houston, 237 F.3d 567, 576 (5th Cir. 2001) ("The statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state. . . . Texas has a two year statute of limitations for personal injury claims . . . ."); Mellon Service Co. v. Touche Ross & Co., 17 S.W.3d 432, 435 (Tex. App. - Houston [1 Dist.] 2000) (statute of limitations for civil conspiracy is two years).

Defendants argue that Plaintiffs' equal protection and due process claims asserted under 42 U.S.C. § 1983 are time barred to the extent they are based on conduct occurring more than two years prior to August 6, 2010, the date of the Second Amended Complaint (which for the first time made Section 1983 claims based upon conduct other than passage of the Board Resolution).  (D.E. 133 at 8.)  Defendants make the same argument with respect to Plaintiffs' civil conspiracy claim.  (D.E. 133 at 8-9.)

Plaintiffs agree that the relevant statute of limitations period is two years, but contend that Defendants have not met their burden to demonstrate when Plaintiffs' claims in fact accrued.[3]  (D.E. 153 at 4.)  With respect to the two allegations that Defendants

---

[3] As a preliminary matter, Plaintiffs disagree with Defendants' argument that there is no relation back, and that the relevant time frame is two years from the second Amended Complaint, or August 6, 2008.   Under

9

claim to be time barred (CMC's failure to call Plaintiffs when their patients presented to CMC and CMC's denial of ICD privileges to Plaintiff), these issues were inherently undiscoverable until at least "late 2007 or early 2008."  Equitable tolling thus applies. (D.E. 153 at 5.)  Plaintiffs also argue that the entire scope of the claim must be considered, and rely upon the "continuing violation theory."  (D.E. 153 at 5-7.)

Federal law determines when a § 1983 cause of action accrues.  Bates v. Price, 368 Fed. Appx. 594, 595 (5th Cir. 2010) (citing Gartrell v. Gaylor, 981 F.2d 254, 257 (5th Cir. 1993)).  The statute of limitations begins to run "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured."  Piotrowski v. City of Houston, 237 F.3d 567, 576 (5th Cir. 2001). A plaintiff's awareness encompasses two elements: "(1) the existence of the injury; and (2) causation, that is the connection between the injury and the defendant's actions."  Id. "A plaintiff need not know that she has a legal cause of action; she need know only the facts that would ultimately support claim.  Actual knowledge is not required if the circumstances would lead a reasonable person to investigate further."  Id.  "[T]he defendant has the burden of establishing affirmative defenses, including a statute of limitations."  Frame v. City of Arlington, 616 F.3d 476, 489 (5th Cir. 2010).

As an initial matter, the Court need not address Defendants' arguments with respect to Plaintiffs' civil conspiracy claim (D.E. 133 at 8-9), as that claim is dismissed for the reasons stated herein.  However, as to Plaintiffs' Section 1983 claim, the Court concludes that Defendants have entirely failed to meet their burden on the statute of

---

Tex. Civ. Prac. & Rem. Code § 16.068 (which is the law under FRCP 15(c)(1)(A) that provides the statute of limitations), relation back applies unless the amendment is based on a wholly new transaction or occurrence.  Here, the amendments all relate to the same underlying events.  (D.E. 153 at 4 n.3).  The Court, however, need not resolve this issue as it concludes that Defendants have not met their burden on the statute of limitations issue.

limitations affirmative defense.   In their motion, they state only, "any portion of Plaintiffs' § 1983 claims that is based on alleged conduct occurring prior to August 6, 2008 – such as not getting emergency room calls or the alleged discriminatory denial of ICD privileges in May 2007 that Plaintiffs assert in their Second Amended Complaint – is barred by limitations."  (D.E. 133 at 8.)  They offer no argument as to when the claims accrued for purposes of calculating the limitations period, or any related discussion, other than this one conclusory statement.   Without any substantive argument as to the limitations issue, Defendants cannot meet their burden on the statute of limitations defense on summary judgment, and the Court does not address this issue further.  See, e.g., Frame, 616 F.3d at 489 ("[A]s always, the defendant has the burden of establishing affirmative defenses, including a statute of limitations, and so it is the **[defendant's] obligation to demonstrate expiration of the limitations period**.") (emphasis added); Avila v. State Farm Fire & Cas. Co., 147 F. Supp. 2d 570, 582 n.71 (W.D. Tex. 1999) ("A defendant . . . who moves for summary judgment based on the affirmative defense of the expiration of the statute of limitations, assumes the burden of showing that as a matter of law the suit is barred.").

  **B.**  **Due Process Claims**

  Defendants argue that they are entitled to summary judgment on Plaintiffs' substantive and procedural due process claims, which are based upon (1) closing of the CMC cardiology department pursuant to the Board Resolution and (2) allegations that employees and staff at CMC did not call Plaintiffs when Plaintiffs' patients presented to the ER.  Defendants' argument is based largely upon their contention that Plaintiffs have no liberty or property interest in their ability to exercise staff privileges at CMC, or to

11

receive calls or referrals from CMC's ER staff.  (D.E. 133 at 9; <u>see also</u> D.E. 174-1 at 9-17.)  Plaintiffs respond that they have both a liberty and a property interest in their staff privileges at CMC.  Plaintiffs note that this Court has already found a protectable property interest with respect to their staff privileges, and argue that they also have a liberty interest in practicing at CMC.

### 1.    Liberty Interest

"The Due Process Clause . . . protects an individual's liberty interest which is viewed as including an individual's freedom to work and earn a living and to establish a home and position in one's community.  It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure."  <u>Martin v. Mem. Hosp. at Gulfport</u>, 130 F.3d 1143, 1148 (5th Cir. 1997) (citations omitted).   A liberty interest is affected only when a state action "effectively forecloses [a doctor] from practicing in the area."  <u>Id.</u>   The Fifth Circuit in <u>Martin</u> outlined three types of state action that might result in "foreclosure from practicing in the area," and thus implicate a liberty interest.  These are (1) state action that "stigmatize[s] [a doctor] and so damage[s] his reputation in the community that he could not earn a living as a [doctor]," (2) denial of a license to practice, or (3) "denying [the doctor] collateral credentials necessary for pursuing his occupation."  <u>Id.</u> at 1148-1149.  The only potentially applicable scenario here may be "stigmatization" in the community, although this is all but foreclosed by the available evidence.  There is no dispute that Plaintiffs have not been (and would not be) prevented from practicing in the Victoria community as a result of CMC's actions, either at DeTar Hospital or as a part of their

private practice.  If anything, the evidence demonstrates that these three physicians are highly respected amongst patients in the community, and are actively sought out by those seeking cardiac care, notwithstanding any of the actions that CMC has allegedly taken.[4]

Any actions taken by CMC have not significantly impacted Plaintiffs' ability to practice in Victoria, Texas, and thus Plaintiffs may not claim a liberty interest.

### 2.    Property Interest

"[P]rocedural due process is a positivist notion, designed to protect property interests, existing not by force of the due process clause itself, but established by reference to some independent source, such as state law or contract.  The extent to which an individual interest is a property interest protected by the due process clause must be determined by an examination of the source of the interest. . . . [W]here the interest is created by some state law or contract, the limitations of the interest are determined by examination of the state law or contract."  Martin, 130 F.3d at 1147 (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972); Perry v. Sindermann, 408 U.S. 593, 601 (1972).)  "It is well-settled in this circuit that a physician's staff privileges may constitute a property interest protected by the due process clause of the fourteenth amendment."  Darlak v. Bobear, 814 F.2d 1055, 1061 (5th Cir. 1987).  Both substantive and procedural due process rights are implicated when an individual has a constitutionally protected property interest.  Whiting v. University of Southern Miss., 451 F.3d 339, 344 (5th Cir. 2006) ("The requirements of procedural due process apply only to

---

[4] The Court notes that while Plaintiffs would not be entirely foreclosed from practicing in the Victoria area as a result of CMC's actions, the actions would nevertheless constitute a significant infringement upon their practices.  At the Preliminary Injunction hearing in this case, Mr. Brown testified that approximately 66 % of the ambulances in Victoria go to CMC, as opposed to DeTar Hospital.  (D.E. 37 at 273.)  Mr. Brown also testified that 40 % of CMC's cardiac patients come through the CMC Emergency Room.  (D.E. 37 at 274.)  Passage of the Board Resolution and closure of the cardiology department would in effect prevent Plaintiffs from seeing and treating a large number of cardiac patients that arrive at the CMC ER, which in turn is a significant number of the cardiac patients in Victoria.

the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. . . .  Similarly, substantive due process offers protection to an individual only if that person has either a 'constitutionally protected property interest,' or a similarly protected liberty interest.").

With respect to medical staff privileges, the Fifth Circuit has explained: "[w]here medical staff privileges have been held to constitute an interest protected by the fourteenth amendment, it has been because there was **an explicit or implicit agreement providing for no termination of the privileges without cause and a hearing** . . . .'" Darlak, 814 F.2d at 1061 (citing Daly v. Sprague, 675 F.2d 716, 727 (5th Cir. 1982) (emphasis added)).  In Darlak, the Fifth Circuit found that the hospital's "regulations providing for a hearing prior to the suspension or termination of staff privileges implies that such privileges will be suspended or terminated only for cause, and . . . therefore such privileges constitute a property interest protected by the fourteenth amendment." Darlak, 814 F.2d at 1062; Marin v. Citizens Memorial Hosp., 700 F. Supp. 354, 358 (S.D. Tex. 1988) ("the fact that the by-laws provide detailed procedures to be followed when removing or limiting a doctor's clinical privileges tends to establish the existence of a protected property interest.").

As an initial matter, the Court again rejects Defendants' argument (D.E. 133 at 11 n.23) that the Board Resolution does not in fact terminate Plaintiffs' privileges, for reasons already stated elsewhere on the record.  (See D.E. 153-12 at 2-3 (Preliminary Injunction Hearing transcript).) The Board Resolution has the functional effect of terminating Plaintiffs' privileges at CMC, and does so without providing Plaintiffs any opportunity for a hearing or appellate process.  Mr. Brown in fact admitted as much in an

e-mail to staff, in which he explained that pursuant to this Court's TRO, "Citizens Medical Center must allow Parikh, Chandna, and Galla [sic] **to exercise their staff privileges**.  This is until further notice as the court's decision is under appeal."  (D.E. 131-22 at 2) (emphasis added).  Other evidence in the summary judgment record also supports this conclusion.  See, e.g., D.E. 153-8 at 33-34 (Dr. Diaz Depo.) (agreeing that the Board Resolution would "curtail" Plaintiffs' privileges); D.E. 153-14 at 3 (2/17/10 Citizens Medical Center Report) (stating that closure of the Cardiology Service would "result in some cardiologists having their privileges curtailed."); D.E. 153-76 at 2 (Doctor's Page, Feb. 17, 2010) ("[T]he Board of Directors has closed the department of cardiology such that Doctors Campbell, Krueger, Oakley, Tillman, and Junor will be the exclusive provider of cardiology services at Citizens Medical Center.  Other cardiologists will remain as members of the Medical Staff but **will not be able to practice cardiology at Citizens Medical Center**.") (emphasis added)).

With this in mind, the Court considers whether there exists an "explicit or implicit agreement providing for no termination of the privileges without cause and a hearing . . . .,'" Darlak, 814 F.2d at 1061, so as to create a property interest.  Here, the right to a hearing is present in three separate CMC procedures.  First, CMC's Hospital Bylaws provide: "when clinical privileges are proposed by recommendation [by the medical staff] to be reduced, altered, suspended or terminated, the staff member shall be afforded the opportunity for a **hearing**.  The process of hearing and appeal shall be conducted according to procedures developed, with the approval of the Board, and incorporated in the Medical Staff Bylaws." (D.E. 153-3 at 6; D.E. 131-8 at 6 (emphasis added).) Second, CMC's Medical Staff Bylaws provide: "[t]he following recommendations or

decisions, when made by the Executive Committee, shall entitle the affected practitioner to a **hearing**: (8) Denial of requested clinical privileges; (9) Reduction of clinical privileges; (10) Suspension of clinical privileges; (11) Revocation of clinical privileges. (D.E. 153-4 at 12 (emphasis added).)   Finally, CMC's Hearing & Appellate Review Procedure manual also provides for notice and hearings upon actions related to privileges, similar to that in the Medical Staff Bylaws.  (D.E. 153-5 at 5.)

The Court thus concludes that the procedures outlined above providing for a hearing prior to suspension, alteration, or termination of staff privileges thus creates a property interest in this case.  The Court already ruled as much in issuing the preliminary injunction in this case.  (D.E. 29 at 2 ("Plaintiffs have a substantial likelihood of success on the merits related to their claims of substantive due process violations, as Plaintiffs have demonstrated that they have a property interest in their staff privileges at CMC.").)

The Court further concludes, contrary to Defendants' argument, that Plaintiffs have a property interest in receiving phone calls or referrals from CMC's staff or employees when their patients present to CMC, as part of their privileges.  (D.E. 133 at 14-15; D.E. 174-1 at 14-17.)   A basic component of Plaintiffs' privileges at CMC includes their right to be contacted when their cardiac patients present to CMC.  Clearly, Plaintiffs cannot adequately treat their patients when they are not even notified that their patients are at CMC with a cardiac related condition.   (D.E. 153-1 at 3 (Dr. Parikh Affidavit) ("An integral part of having privileges at CMC is having the ability to be called when one of my patients presents at the emergency room.  In fact, that is one of the primary reasons I maintain privileges at CMC."); D.E. 153-30 (Dr. Chandna Affidavit)

(same); D.E. 153-81 (Dr. Gaalla Affidavit) (same)).  Defendants' attempt to separate the various components of Plaintiffs' clinical privileges at CMC is unpersuasive.

In sum, the Court concludes that Plaintiffs have a constitutionally protected property interest in their clinical privileges at CMC.  On summary judgment, Defendants address only whether such rights exist, not whether the evidence demonstrates that such rights have been violated.  As such, the Court does not address this issue.

C.      Equal Protection Claim

"The Equal Protection Clause directs that persons similarly situated should be treated alike."  Williams v. Bramer, 180 F.3d 699, 705 (5th Cir. 1999).  "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  Id.

In the context of employment discrimination, the Fifth Circuit has explained that "Section 1983 and Title VII are parallel causes of action.  Accordingly, the inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII."  Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div., 512 F.3d 157, 166 (5th Cir. 2007) (internal quotation marks omitted).  "To establish a prima facie case of discrimination under Title VII, a plaintiff may prove her claim either through direct evidence, statistical proof, or the test established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998).  Here, Plaintiffs rely upon direct evidence of discrimination, and therefore do not employ the McDonnell Douglas burden shifting test.  See, e.g., Jackson v. Dallas County

Juvenile Dep't, 288 Fed. Appx. 909, 911 (5th Cir. 2008) ("In cases where no direct evidence exists, we analyze discrimination claims . . . using the burden-shifting framework created by the Supreme Court in McDonnell Douglas Corp.").

Plaintiffs' equal protection claim is grounded in an allegation that Defendants discriminated against them on the basis of their race, as they are of Indian origin. Defendants contend that they are entitled to summary judgment because "there is no evidence of any discriminatory purpose behind the alleged acts of discrimination," and because "the summary judgment proof conclusively establishes that there was no such discriminatory purpose." (D.E. 133 at 16-24; D.E. 174-1 at 17-26.) Plaintiffs strongly disagree, pointing to significant evidence in the record, and contending that Defendants' discriminatory intent may be proven by direct evidence. (D.E. 153 at 19-20.)

The Court need not recount in this Order all of the evidence in the record establishing direct evidence of racial discrimination in this case. Rather, the Court focuses on some of the more egregious evidence supporting Plaintiffs' racial discrimination claim. Most prominent is a memorandum dated March 20, 2007 from CMC Administrator David Brown, which states:

> I feel a sense of **disgust** but am more concerned with what this means to the future of the hospital as **more of our middle Eastern born physicians demand leadership roles** and demand influence over situations that are hospital issues . . . . [This] will **change the entire complexion of the hospital and create a level of fear among our employees.**

(D.E. 153-36 at 3) (emphasis added). These statements are clearly derogatory, as even Mr. Brown himself admits. (D.E. 153-19 at 7-8 (CMC Depo.) (stating that above statement is "very clearly" derogatory); see Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 415 (5th Cir. 2003) ("[D]irect evidence includes any statement or document which

shows on its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis – for the adverse employment action.").    When the chief CMC Administrator displays such overt racial animus towards Plaintiffs, this racial animus necessarily permeates throughout the rest of the hospital, and is strong evidence of discrimination.  See, e.g., Coleman v. Exxon Chemical Corp., 162 F. Supp. 2d 593, 621 (S.D. Tex. 2001) ("A supervisor's repeated use of racial epithets may constitute direct evidence that a contested employment decision was motivated by racial animus.").  Brown's statements could, for example, indicate to CMC employees that such attitudes were tolerated or even encouraged, and do not foster the type of non-discriminatory environment that is envisioned by the equal protection clause.

Plaintiffs have also presented evidence of racism and derogatory comments by other CMC employees.  For example, Dorothy Hayes (CMC's operating room head) expressed in an e-mail message that "[w]e should celebrate when all this is over . . . then work on **getting the Indians off the reservation**."  (D.E. 153-20) (emphasis added).  In response, Drs. James and Christine Taylor stated, "I love that turn of phrase – off the reservation since they the **Indians went off the reservation** on how to treat patients and colleagues."  (D.E. 153-20) (emphasis added).  As another example, an individual not affiliated with CMC (Ted) sent an e-mail to Mr. Brown, stating "I noticed that Paul Holm has some suspicious damage to his car.  In fact there were several rocks stuck in the grill."  Mr. Brown received this e-mail and forwarded it to Mr. Holm, stating "What's this about? Is Ted thinking about **my Indian troubles**, Are you making a connection?" (D.E. 153-64 at 2) (emphasis added). Mr. Brown admits that his "Indian troubles" statement was a direct reference to Plaintiffs.   (D.E. 153-19 at 4 (CMC Depo.).)

Numerous other correspondences between various CMC officials referred to Plaintiffs as the "Indians" in a derogatory manner, sometimes used in conjunction with the term "cowboys," meaning Dr. Campbell's cardiology group.  (See, e.g., D.E. 153-24 at 5 (Atzenhofer Depo.).[5]  As the Fifth Circuit has explained, "[w]hen a person or persons with decision making authority evinces racial animus that may constitute direct evidence of discrimination. . . . We have also previously observed that racial epithets undoubtedly demonstrate racial animus."  Jones v. Robinson Property Group, L.P., 427 F.3d 987, 993 (5th Cir. 2005).

Numerous depositions also demonstrate a genuine issue of material fact with regard to Plaintiffs' equal protection claim.  For example, former CMC E.R. physician Allen testified that there were "racial tensions with regards to the issues between the [Plaintiffs] and the hospital."  (D.E. 153-2 at 26-27 (Q: "Can you tell us what those racial tensions were?" A: "That the physicians practicing were from Middle East or India, not American-born, that – especially when they referred to them as 'the Indians.'").)  Another physician stated that it was "common knowledge at CMC that David Brown did not want physicians of Indian origin in leadership roles at CMC.  I know this because CMC's employed physician recruiter . . . provided me two resumes of physicians of Indian origin and told me that I could recruit them if I wanted, because David Brown did not want to recruit any more Indian physicians."  (D.E. 153-26 at 3 (Dr. Minocha Aff.).)  The affidavits Defendants submitted on behalf of several board members, which claim that racial animus played no role in passage of the Board Resolution, are wholly insufficient to carry the burden on summary judgment.  (D.E. 131-1 (Donald Day Affidavit); 131-2

---

[5] While the Court certainly agrees with Defendants that not every reference to Plaintiffs as "Indian" supports a claim of discrimination, particularly in light of their Indian heritage, it is the derogatory manner in which this term was used that is of concern in this litigation.

(Joe Bland Affidavit); 131-3 (Dr. Andrew Clemmons Affidavit); 131-4 (Jennifer Hartman Affidavit); 131-6 (Luis Guerra Affidavit); 131-10 (David Brown Affidavit).) Moreover, the mere fact that Plaintiffs may refer to themselves as "the Indians" (D.E. 131-31 at 4; 131-30 at 3) does little to negate the clear negative connotations of the term as used in other contexts.

There is a genuine dispute as to whether racial animus was the motivating factor behind the conduct at issue here. For example, Brown's statement that "frequent absences" led to Dr. Chandna's removal from the peer review committee, rather than racial animus, is in genuine dispute. (D.E. 153-8 at 15 (Dr. Diaz Depo.) (stating that Dr. Chandna missed only one peer review committee meeting and this did not constitute "frequent absences"); D.E. 131-20 (Peer Review Committee attendance from 2007-2009, showing several absences).) The same is true of Plaintiffs' removal from the Chest Pain Center committee. (See D.E. 153-35 at 2 (discussing removal of "PCG" from the Chest Pain Center committee); D.E. 131-14 (2008 Chest Pain Center attendance record); D.E. 153-7 at 5 (Dr. Walrod Depo.) (stating that Plaintiffs were "just taken off the [attendance] list" of the Chest Pain Center committee).) As another example, although Defendants claim that Plaintiffs' "disruptive" behavior at several hospital meetings was a primary reason for the Board Resolution and other actions, Dr. Diaz (chief of staff at CMC since July 2009) testified that he was not aware of any such disruptive conduct. (D.E. 153-8 at 4; see also D.E. 153-9 at 17-18 (Dr. Stone Depo.) (stating that he had never known Plaintiffs to be disruptive); but see D.E. 153-29 at 2 (letter from David Brown to Dr. Chandna discussing "disruptive behavior"); D.E. 153-71 at 5 (Aug. 19, 2009 board meeting minutes, stating that problems with Plaintiffs are "getting worse"); D.E. 153-73

at 4 (Dec. 16, 2009 board meeting minutes, discussing "disruptive behavior").  There is a serious factual dispute as to the motivation behind nearly every action taken against Plaintiffs at CMC, up to and including the Board Resolution.

The summary judgment evidence thus demonstrates a genuine issue of material fact as Plaintiffs' equal protection claim.   The evidence presented is more than sufficient to demonstrate the factual dispute at issue here, and suggests that the actions at issue (up to and including attempted passage of the Board Resolution) were motivated by racial animus.   Defendants have failed to meet their burden on summary judgment, and Plaintiffs' equal protection claim may therefore proceed.

### D.      Civil Conspiracy Claim

The elements of civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a proximate result."   Zurita v. Lombana, 322 S.W.3d 463, 482 (Tex. App. – Houston [14th Dist.] 2010).  It is well established that "the acts of a corporate agent are the acts of the corporation, and a corporation cannot conspire with itself.  As a matter of law, a corporation or other company cannot conspire with itself, no matter how many of its agents participate in the complained of action." Elliott v. Tilton, 89 F.3d 260, 265 (5th Cir. 1996).  In other words, "a corporation cannot conspire with itself through its agents."   Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc., 300 S.W.3d 348, 381 (Tex. App. – Dallas 2009).

CMC argues that dismissal of the civil conspiracy claim against it is appropriate because, as a governmental entity, it is entitled to sovereign immunity, subject to the Texas Tort Claims Act.  (D.E. 133 at 25.)  Moreover, CMC argues that Plaintiffs have no

evidence to support their civil conspiracy claim, as there is no evidence of a meeting of the minds between CMC and the other defendants. (D.E. 133 at 25.)  Finally, Plaintiffs' claims fail because CMC was incapable of conspiring with itself; the other Defendants were all agents of CMC at the relevant times.  (D.E. 133 at 25.)  Plaintiffs respond that CMC is not immune from suit for a conspiracy to violate constitutional rights (D.E. 153 at 35), and that there is evidence of a "meeting of the minds." (D.E. 154 at 17.)  With respect to this last point, Plaintiffs contend that Mr. Brown is in fact an employee of BioCare, Inc., not CMC, and as such is an independent contractor to CMC, not an employee.  Plaintiffs also contend that Dr. Campbell is not and cannot be an employee of CMC.  (D.E. 154 at 19.)

As an initial matter, the Court has already rejected Plaintiffs' argument as to the legality of Dr. Campbell's employment with CMC, and thus he is an employee for purposes of this Order and the civil conspiracy analysis.  (D.E. 170.)  As to Mr. Brown, even if it is true that he is considered an "independent contractor" of CMC rather than a direct employee, (see D.E. 153-79; 153-80), Texas law makes clear that "independent contractor and agency status are not . . . mutually exclusive."  Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552, 558 (Tex. App. – Houston [14th Dist.] 1997); Nocando Mem Holdings, Ltd. v. Credit Commercial de France, 2004 WL 2603739, at *13 n.7 (W.D. Tex. Oct. 6, 2004) ("[A]n independent contractor may or may not be an agent."). The real question is whether Mr. Brown may be considered an agent of CMC, not whether he is an independent contractor.   Under Texas law, "[a]gency is a consensual, fiduciary relationship between two parties, an agent and a principal, where the agent agrees to act on the principal's behalf, subject to the principal's control, and the principal

confers on the agent the power to act on the principal's behalf."  Schakosky v. Client
Servs., Inc., 634 F. Supp. 2d 732, 735 (E.D. Tex. 2007) (citing Walker Ins. Servs. v.
Bottle Rock Power Corp., 108 S.W.3d 538, 549 (Tex. App.-Houston [14th Dist] 2003, no
pet.); Royal Mortgage Corp. v. Montague, 41 S.W.3d 721, 732 (Tex.App.-Fort Worth
2001, no pet.)).

Here, there can be no serious dispute that Mr. Brown is in fact an agent of CMC.
In fact, Plaintiffs' case depends in large part on this being so.   The Second Amended
Complaint, for example, states that "CMC *through its administrator David Brown*,
arbitrarily and without cause declared that the Physicians were no longer members of the
Chest Pain Center committee," (D.E. 91 at 5), and often refers to Brown as a "CMC
Administrator."   Moreover, Plaintiffs took Mr. Brown's deposition as a corporate
representative of CMC.  (D.E. 153-19.)  Only now do Plaintiffs attempt to label Mr.
Brown as an independent contractor, devoid of agency status.  The evidence sufficiently
establishes that Brown (in addition to the other individual defendants) was acting as an
agent of CMC with respect to the events giving rise to this suit (See D.E. 131-10 at 2-3
(Brown Aff.) ("With respect to my conduct and activities at CMC, including any conduct
and activities related to the Plaintiffs . . . I have done so in the course and scope of my
employment with CMC through a management contract that my company has with CMC.
During all relevant times I have acted on behalf of CMC and held myself out to others as
acting on behalf of CMC.")); D.E. 155-80 at 2 (Management Agreement between
BioCare, Inc. and CMC, providing that Brown was retained to "supervised and manage
the day-to-day operation of the Hospital . . . .").

As Brown (as well as Dr. Campbell) were agents of CMC at all relevant times in this litigation, Plaintiffs may not maintain a civil conspiracy claim. Texas Integrated Conveyor Systems, Inc., 300 S.W.3d at 381 ("a corporation cannot conspire with itself through its agents."). This claim is hereby dismissed.

### E.    Qualified Immunity

The individual Defendants (Board Member Defendants and Brown) raise the defense of qualified immunity in addition to those arguments raised above with respect to CMC. (D.E. 120, 134, 135.)[6]  Having concluded that Plaintiffs may maintain their causes of action under 42 U.S.C. § 1983 for violations of substantive and procedural process, as well as equal protection, the Court next considers Defendants' claims of qualified immunity.[7]

### 1.    Applicable Law

The doctrine of qualified immunity offers a shield against civil liability for government employees "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808, 815 (2009). "[W]hether an official protected by qualified immunity may be held

---

[6] The parties do not dispute that the Board Member Defendants are government officials. Each was appointed by the county commissions of Victoria County and, as members of CMC's Board, they oversee and govern a publicly-owned hospital. (D.E. 134 at 8 n.16.)

[7] Defendants also argue that they are entitled to official immunity with respect to Plaintiffs' state law civil conspiracy claim. The Court, however, has already dismissed this claim and need not address this argument.

personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987); see Wernecke v. Garcia, 591 F.3d 386, 391 (5th Cir. 2009).

"When a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment on that basis, a court must decide (1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged misconduct. Qualified immunity is applicable unless the defendant's conduct violated a clearly established constitutional right. To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379, 382 (5th Cir. 2009).  The Supreme Court in Pearson recently clarified that courts "'should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Pearson, 129 S .Ct. at 818.

If an official's actions are "objectively reasonable" in light of "law which was clearly established at the time of the disputed action," then the official is entitled to qualified immunity.  Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010).  "Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury."  Id.  However, "in certain circumstances where there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question."  Mesa v. Prejean, 543 F.3d 264, 269 (5th Cir. 2008).

"The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity. Once the movant asserts this affirmative defense, the burden shifts to the plaintiff to rebut it."  Beck v. Texas State Bd. of Dental Examiners, 204 F.3d 629, 633-34 (5th Cir. 2000).   "If, upon viewing the evidence in the light most favorable to the non-movant, reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity."  Harper v. Harris County, Tex., 21 F.3d 597, 600 (5th Cir. 1994); Scott v. Harris, 550 U.S. 372, 377 (2007) (facts must be viewed in "light most favorable to the party asserting the injury"); Brown, 623 F.3d at 253 ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor.") (citations omitted).

### 2.    Application

The Board Member Defendants argue that they are entitled to qualified immunity for all causes of action raised against them, and that they should at the very least be entitled to partial summary judgment with respect to all actions at issue in this case other than passage of the Board Resolution, as that is the only action with which they had any personal involvement.  (D.E. 134 at 6; see also D.E. 175-1.)[8]  Defendant Holmes states that he is entitled to summary judgment on all claims because he did not even participate in passage of the Resolution.  (D.E. 134 at 6 n. 13.)

---

[8] Plaintiffs do not specifically respond to this argument in their brief, but state that "Plaintiffs assert that the board's resolution of February 17, 2010 violates" their due process and equal protection rights.  (D.E. 154 at 4; see also D.E. 175-1 at 5.)  The Court understands Plaintiffs' constitutional claims against the Board Member Defendants to relate only to passage of the Board Resolution and actions related thereto.

The Court first addresses whether "the facts that a plaintiff has . . . shown make out a violation of a constitutional right."  129 S. Ct. at 815-16.  For the reasons already discussed above, the Court finds that Plaintiffs have provided sufficient facts to make out a violation of their due process and equal protection rights, so as to defeat summary judgment on qualified immunity grounds.

With respect to the second inquiry, "whether that right was 'clearly established' at the time of the defendant's alleged misconduct," the Court concludes that both Plaintiffs' due process and equal protection rights were clearly established.  As the Court has already found that passage of the Board Resolution did not implicate Plaintiffs' liberty interests, the qualified immunity analysis must focus solely on whether Plaintiffs had a clearly established property interest in their staff privileges.   The Court's discussion of the creation of a property interest with respect to medical staff privileges forecloses the possibility that "reasonable persons could conclude that Plaintiffs had no due process . . . property interest in the ability to exercise their staff privileges at CMC."  (D.E. 134 at 12.)   The Fifth Circuit's 1987 <u>Darlak</u> decision clearly established that a hospital's "regulations providing for a hearing prior to the suspension or termination of staff privileges implies that such privileges will be suspended or terminated only for cause, and . . . therefore such privileges **constitute a property interest protected by the fourteenth amendment**."  <u>Darlak</u>, 814 F.2d at 1062 (emphasis added).  The court's decision in <u>Marin v. Citizens Memorial Hosp.</u>, 700 F. Supp. 354, 358 (S.D. Tex. 1988), that "by-laws provid[ing] detailed procedures to be followed when removing or limiting a doctor's clinical privileges tends to establish the existence of a protected property

interest," also supports the conclusion that property interest in medical staff privileges are clearly established.[9]

The same is true of Plaintiffs' equal protection claim.  The "great deference" granted to a hospital board's staffing decisions clearly does not encompass the decision to make staffing decisions based upon the race of physicians.  Defendants do not, and indeed cannot, claim that the right not to be discriminated against on the basis of race was not "clearly established" at the time of the misconduct.

Thus, the Court concludes that Plaintiffs' due process and equal protection rights were clearly established at the time of the alleged violations in this case, and that Plaintiffs have presented sufficient evidence to overcome Defendants' qualified immunity summary judgment motions.

The Court briefly addresses the remaining issue of Paul Holm's liability, in light of his abstention from the vote on the Board Resolution.  The parties agree that Mr. Holm did not in fact vote on the Board Resolution itself, as Mr. Holm stated in his deposition. (D.E. 154 at 5 n.4; D.E. 153-67 at 8 (Holm stating that he abstained because Dr. Yahagi was his client))  While Mr. Holm may have, as Plaintiffs argue, participated in events and discussions leading up to the Board Resolution, the Court understands Plaintiffs' claim against the Board Member Defendants to be based upon passage of the Resolution itself, which would have the effect of revoking their privileges.  As Mr. Holm undisputedly had

---

[9] Defendants argue that to state a viable substantive due process claim, Plaintiffs must demonstrate that a state official acted with "culpability beyond mere negligence," or conduct that "shocks the conscience." (D.E. 134 at 10-11.)  Plaintiffs dispute this.  (D.E. 154 at 13-15.)  As the Fifth Circuit has explained, "[s]ubstantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.  To state a viable substantive due process claim, the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence," and that the conduct "shocks the conscience."  Marco Outdoor Advertising, Inc. v. Regional Transit Authority, 489 F.3d 669, 673 n.3 (5th Cir. 2007).  While Defendants believe there to be "no evidence" to meet this standard, the Court concludes that Plaintiffs have presented evidence at this stage to satisfy this "shocks the conscience" standard.

no personal role in passage of the Resolution, he alone is entitled to summary judgment and dismissal from this case.   See Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action"); see Cullum v. Texas Dep't of Crim. Justice, 2008 WL 4415155, at *6 (S.D. Tex. Sept. 24, 2008) (citing Thompson).

In sum, the Court denies Defendant Board Members' Motion for Summary Judgment on qualified immunity grounds, with the exception of Defendant Holms, who undisputedly had no personal involvement in passage of the Board Resolution.  (D.E. 134.)  Defendant Brown's Motion for Summary Judgment primarily raises the same arguments, except it argues that his immunity extends to other actions at issue, beyond the Board Resolution.  (D.E. 135; see also D.E. 176-1.)  This motion is denied for the same reasons.

## E.    Official Immunity

### 1.    Background

Plaintiffs bring state law causes of action against Dr. Campbell for tortious interference with contractual relations, tortious interference with prospective relations, and defamation, along with a claim of civil conspiracy.[10]   Campbell seeks summary judgment that he is entitled to official immunity with respect to these causes of action. (D.E. 120.)

Plaintiffs' claim of tortious interference with contractual relations is based upon their allegations that Campbell "interfered with the Physicians' contractual relations with CMC and their patients."  He allegedly attended peer review meetings to complain about

---

[10] As noted above, the Court has dismissed Plaintiffs' civil conspiracy claim, and thus does not address Dr. Campbell's official immunity argument as to this claim.

Dr. Gaalla's misconduct, made a presentation to the Medical Executive Committee on January 12, 2010, in which he made false representations to the committee concerning Plaintiffs, and wrote in patient J.B.'s chart that Dr. Parikh did not have privileges to perform a necessary procedure when Dr. Parikh did in fact have such privileges.  (D.E. 91 at 20.)  Campbell also allegedly "misrepresented to CMC that the Physicians provided poor medical care to patients."  (D.E. 91 at 20-21.)   In addition, Plaintiffs make other allegations regarding Campbell's alleged attempt to shorten or revise Plaintiffs' reappointment agreement with CMC.  This conduct, Plaintiffs allege, ultimately resulted in Dr. Campbell's cardiology group being given the exclusive right to practice at CMC, to the exclusion of Plaintiffs.  (D.E. 91 at 22.)

Plaintiffs' allegations as to tortious interference with prospective relations focus upon Dr. Campbell's alleged misrepresentation in patient J.B.'s medical chart, so as to induce J.B. to become Dr. Campbell's patient and then steer the patient to Dr. Yahagi. (D.E. 91 at 22-23.)  Plaintiffs' defamation claims are also based in part upon the false statements in J.B.'s medical chart, as well as false statement about Plaintiffs in correspondence to the peer review committee and other similar bodies.  (D.E. 91 at 23-25.)

### 2.    Discussion

Under Texas law "[a] governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith.  Because official immunity is an affirmative defense, **to obtain summary judgment on official immunity, the governmental employee must conclusively prove each element of the defense**."

University of Houston v. Clark, 38 S.W.3d 578, 580 (Tex. 2000) (emphasis added); see City of Pasadena v. Belle, 297 S.W.3d 525, 530 (Tex. App. – Houston [14th Dist.] 2009) ("Because official immunity is an affirmative defense, the burden rests on the defendant to establish all of the elements of the defense.").  "Official immunity is designed to protect public officials from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light because the public would suffer if government officers, who must exercise judgment and discretion in their jobs, were subject to civil lawsuits that second-guessed their decisions."  City of Forth Worth v. Robinson, 300 S.W.3d 892, 897 (Tex. App. – Ft. Worth 2009).

As an initial matter, the Court notes that it has already ruled that Dr. Campbell is a "governmental employee," and thus is entitled to raise the defense of official immunity. (D.E. 170.)  The Court also does not find serious dispute that Dr. Campbell was, at all times relevant to this lawsuit, performing a "discretionary" as opposed to "ministerial function." (D.E. 120 at 5-6.)  Although Plaintiffs dispute whether Dr. Campbell was acting within the scope of his authority (D.E. 143 at 24-25), the allegations at issue all relate to patient care and peer review.  These general duties are within the scope of Dr. Campbell's role as a physician.  See Davila v. Flores, 6 S.W.3d 788, 793 (Tex. App. – Corpus Christi 1999) ("An official acts within the scope of her authority if she is discharging the duties generally assigned to her. The fact that a specific act that forms the basis of the suit may have been wrongly or negligently performed does not take it outside of the scope of authority.").

The real dispute relates to whether Dr. Campbell's actions were undertaken in "good faith."  (D.E. 120 at 7; D.E. 143 at 15.)  An employee acts in good faith if "a

reasonably prudent [employee], under the same circumstances, could have believed that his actions were correct."  Murray v. Earle, 405 F.3d 278, 294 (5th Cir. 2005).  "To determine if a public official acted in good faith, we use an objective standard, asking whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred."  Maxwell v. Willis, 316 S.W.3d 680, 687 (Tex. App – Eastland 2010) (citing Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 164 (Tex. 2004)).

Campbell states that the evidence supports the conclusion that he acted in good faith, but he relies solely upon his own affidavit.  (D.E. 120 at 7; D.E. 120-1 ("To the extent I made any of the statements or took any of the actions of which the plaintiffs complain, those statements and actions . . . were done in good faith based on honest concerns and beliefs I had at the time.").)  However, the law is clear that "[s]imple subjective pronouncements of good faith by a defendant . . . [is] insufficient as a matter of law to meet the summary judgment movant's burden of showing good faith." Martinez v. City of Laredo, 2001 WL 950704, at *5 (Tex. App. – San Antonio Aug. 22, 2001) (citing Wadewitz v. Montgomery, 951 S.W.2d 464, 467 (Tex. 1997)).  Moreover, the available facts demonstrate many issues of material fact about Dr. Campbell's "good faith" with respect to the state law claims against him, and thus renders summary judgment on official immunity grounds inappropriate.  (D.E. 143 at 17-23; see, e.g., D.E. 143-12 (e-mail from Dr. Campbell outlining problems with Plaintiffs, including "committing Medicare fraud" and "falsifying records"); D.E. 143-20 (e-mail from Dr. Campbell to Mr. Brown) ("Dr. C has repeatedly been dishonest by deliberately deceiving patients in his representation of CMC and Dr. Y.  His actions and counsel to patients are

intentionally deceptive, misleading, and inflammatory.  He has grossly miss represented [sic] the facts and consequently inflamed patient emotion and encouraged a negative opinion toward CMC."); D.E. 143-21 at 8 (report from Dr. Campbell discussing "numerous major concerns regarding Dr. Gaalla's general cardiac care and management").

In sum, Defendant Campbell has failed to meet his burden on summary judgment to establish official immunity.  The Court must therefore deny Defendant Campbell's Motion for Summary Judgment.  (D.E. 120.)

## IV.   Conclusion

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART (1) Defendant Citizens Medical Center's Motion for Summary Judgment (D.E. 133); (2) Defendant Board Members' Motion for Summary Judgment (D.E. 134); (3) Defendant David P. Brown's Motion for Summary Judgment (D.E. 135); and (4) Defendant William Todd Campbell, Jr., M.D.'s Motion for Summary Judgment Based on Qualified Immunity (D.E. 120).

The following claims are hereby dismissed: (1) Plaintiffs' substantive and procedural due process claims based upon their liberty interest in medical staff privileges; (2) Plaintiffs' civil conspiracy claims; and (3) all claims against Defendant Paul Holm. The following causes of action remain against the Defendants:

(1)     CMC: (1) 42 U.S.C. § 1983 claim for substantive and procedural due process violations based upon Plaintiffs' property interest in their medical staff privileges; (2) 42 U.S.C. § 1983 claim for equal protection violations;

(2)    Board Member Defendants (Donald Day, Joe Bland, Andrew Clemmons, M.D., Jennifer Hartman, and Luis Guerra): (1) 42 U.S.C. § 1983 claim for substantive and procedural due process violations based upon Plaintiffs' property interest in their medical staff privileges; (2) 42 U.S.C. § 1983 claim for equal protection violations;

(3)    Mr. Brown: (1) 42 U.S.C. § 1983 claim for substantive and procedural due process violations based upon Plaintiffs' property interest in their medical staff privileges; (2) 42 U.S.C. § 1983 claim for equal protection violations;

(4)    Dr. Campbell: (1) tortious interference with contractual relations; (2) tortious interference with prospective relations; and (3) defamation.

SIGNED and ORDERED this 22nd day of December, 2010.

_____
Janis Graham Jack
United States District Judge