UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| HARISH CHANDNA, M.D., DAKSHESH "KUMAR" PARIKH, M.D., and AJAY GAALLA, M.D., | § § § § | |
| Plaintiffs | § § | |
| v. | § § | CIVIL ACTION NO. 6:10-CV-00014 |
| CITIZENS MEDICAL CENTER, DAVID P. BROWN, DONALD DAY, JOE BLAND, ANDREW CLEMMONS, M.D., JENNIFER HARTMAN, PAUL HOLM, LUIS GUERRA, and WILLIAM TODD CAMPBELL, JR., M.D., Defendants | § § § § § § § § | JURY |

## PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE GREGG COSTA:

COME NOW Plaintiffs Dakshesh "Kumar" Parikh, M.D., Harish Chandna, M.D., and Ajay Gaalla, M.D. (collectively "Physicians" or "Plaintiffs"), and file this their Fourth Amended Verified Complaint for Damages and Injunctive Relief against Defendants Citizens Medical Center ("CMC"), David P. Brown ("Brown"), and William Todd Campbell, Jr., M.D. ("Dr. Campbell") (collectively "Defendants").

## I.
## PARTIES

1.     Drs. Parikh, Chandna, and Gaalla are citizens of the United States and physicians duly licensed to practice medicine in Texas.  Their practices are in Victoria County, Texas.

2.     CMC is a county-owned hospital operating in the State of Texas pursuant to Texas Health and Safety Code Chapter 263 and doing business in Victoria County, Texas at 2701 Hospital Drive, Victoria, Texas 77901-5749.  CMC has been served and has made an appearance in this case.

3.     David P. Brown is the Administrator of CMC.  Mr. Brown has been served and has made an appearance in this case.

4.     William Todd Campbell, Jr., M.D. is a cardiovascular physician licensed to practice in the State of Texas.  Dr. Campbell has been served and has made an appearance in this case.

## II.
## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1367, and 42 U.S.C. § 1983.

6.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims and causes of action occurred in the Southern District of Texas.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

2

## III.
## FACTS

7.     CMC is a 344-bed county-owned hospital in Victoria, Texas.[1]  CMC is operated

by a six-member board of directors and administered by a chief executive officer, David Brown.

8.     The Physicians are cardiologists of Indian origin practicing in Victoria.   Dr.

Parikh is Board Certified in Interventional Cardiology and Cardiovascular Diseases and has been

licensed in Texas since 1993.  Dr. Chandna is Board Certified in Interventional Cardiology and

Cardiovascular Diseases and has been licensed in Texas since 1998.   Dr. Gaalla is Board

Certified in Interventional Cardiology and Cardiovascular Diseases and has been licensed in

Texas since 1993.

9.     This case arises from Defendants' violations of state and federal law by, among

other things, excluding the Physicians from continuing their practice at the CMC, resulting in

patients being denied their right to consult the physician of their choice.  Prior to 2007, the

Physicians regularly admitted patients to CMC and exercised full privileges at the hospital.

However, in early 2007, Defendants' discriminatory misconduct against the Physicians began to

manifest.   During this time and continuing today, the Physicians were discriminated against

based on their race and nationality and regularly referred to at CMC as the "Indians."

Defendants' discriminatory animus towards the Physicians is reflected in the following hospital

documents:

- David Brown (CMC's Administrator) wrote in a memorandum entitled "Memo for Record": "I feel a sense of disgust but am more concerned with what this means to the future of the hospital as more of our middle [sic] Eastern born

---

[1]      While CMC publically promotes itself as a non-profit hospital, it is not a non-profit entity and its actions indicate otherwise.  In one case, for example, when a patient required a coronary artery bypass operation, David Brown intervened and prevented the surgery, insisting, "[n]ot without making financial arrangements. Deposit or something." Exhibit "A."

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

physicians demand leadership roles and demand influence over situations that are hospital issues. . . . [This] will change the entire complexion of the hospital and create a level of fear among our employees." <u>Exhibit</u> "B." Brown has admitted that this was a reference to the Plaintiffs and that he meant it derogatorily.

- Dorothy Hayes R.N.'s (CMC's Director of Surgical Services) email to Christine Taylor, stating: "We should celebrate when all this is over . . . then work on getting the Indians off the reservation." <u>Exhibit</u> "C." Ms. Hayes has admitted that this racist statement was a reference to the Plaintiffs.

- Ann Christiansen's (CMC's Clinical Coordinator) email to David Brown (CMC's Administrator) stating: "Another year with the Indians." <u>Exhibit</u> "D." Ms. Christiansen admitted that this derogatory statement was a reference to the Plaintiffs and that she was never disciplined or otherwise corrected by Mr. Brown for sending the inappropriate email.

- David Brown's (CMC's Administrator) email to CMC board member Paul Holm referring to Plaintiffs as his "indian [sic] troubles." <u>Exhibit</u> "E." Mr. Brown admitted that this statement was a reference to the Plaintiffs. CMC's board of directors have admitted that they have not (and do not plan to) take any disciplinary or corrective action against Brown for his discriminatory misconduct.

- Email from Lisa Atzenhofer (CMC's Director of Cardiopulmonary Care) to David Brown (CMC's Administrator) stating that, "The Inidians [sic] are talking." <u>Exhibit</u> "F." Ms. Atzenhofer admitted that this statement was a reference to Plaintiffs, and Brown admitted that he never disciplined or otherwise corrected any CMC employee for derogatorily referring to Plaintiffs as the "Indians." Brown himself derogatorily referred to the Plaintiffs as the "Indians."

- Email from Dorothy Hayes, R.N. (CMC's Director of Surgical Services) to David Brown (CMC's Administrator) stating, "the Indians have been sending the hearts out of town." <u>Exhibit</u> "G." Ms. Hayes admitted that this statement was a reference to the Plaintiffs. Mr. Brown never disciplined or otherwise corrected Ms. Hayes for sending this email.

- Email from Dr. Campbell (CMC's employed cardiologist) provided to David Brown (CMC's Administrator) entitled "indain [sic] reflections" and discussing ways to remove the Physicians from the hospital. <u>Exhibit</u> "H." It is undisputed that this was a reference to Plaintiffs. Mr. Brown never disciplined or corrected Dr. Campbell for this correspondence. Instead, Mr. Brown and CMC adopted the recommended steps for removing Plaintiffs from the hospital. CMC and Brown also later employed Dr. Campbell and paid him a salary more than two-and-a-half times the amount he earned in private practice. This was even after Dr. Campbell

was involved in a fistfight at CMC with another physician—misconduct for which Dr. Campbell was never even investigated, much less disciplined. *See* <u>Exhibit</u> "I."

- Email from David Brown (CMC's Administrator) to Dr. John Soule (former Chief of Staff at CMC) in which David Brown states: "Give me an alternative that does not involve DeTar buying the practice and moving it to indian [sic] territory." <u>Exhibit</u> "J." According to Mr. Brown, "indian [sic] territory" is a reference to the other hospital in Victoria, DeTar Hospital, where Plaintiffs continue to practice. Brown apparently considers DeTar Hospital and its healthcare professionals to be the "enemy territory."

- An email "joke" produced by CMC dated October 27, 2009, entitled "Mujibar was trying to get a job in India," and ridiculing the accents of persons of Indian origin. <u>Exhibit</u> "K."

- A derogatory email produced by CMC regarding "Indian Muslims" and the President of the United States. <u>Exhibit</u> "L." In a similar fashion, CMC and Brown inserted a photograph of former President William J. Clinton in the CMC Staff Directory under "Gastroenterology." <u>Exhibit</u> "M"

- An email "joke" sent to Ann Christiansen (CMC's Clinical Coordinator) dated February 16, 2010, entitled "THE FOREHEAD DOT," purporting to report a news release from the Indian Embassy ridiculing a religious symbol displayed by certain individuals of Indian origin. <u>Exhibit</u> "N."

- Email "joke" from Ann Christiansen (CMC's Clinical Coordinator) dated May 26, 2009 regarding "THIS IS INDIA" and demeaning India and its workforce. <u>Exhibit</u> "O."

- Email "joke" from James Hayes (former CMC board member) to Dorothy Hayes, R.N. (CMC's Director of Surgical Services) regarding the Indian Embassy in Ottawa and ridiculing a religious symbol displayed by certain persons of Indian origin. <u>Exhibit</u> "P."

- Email from Dorothy Hayes, R.N. (CMC's Director of Surgical Services) to David Brown (CMC's Administrator) stating that Ms. Hayes may be "too suspicious of the Indians." <u>Exhibit</u> "Q."

- Email from Dorothy Hayes, R.N. (CMC's Director of Surgical Services) to David Brown (CMC's Administrator) discussing Dr. Yahagi's attempt to "get the Indians [sic] business." <u>Exhibit</u> "R." Ms. Hayes has admitted that this was a reference to the Plaintiffs. Mr. Brown did not discipline or otherwise correct Ms. Hayes for sending this derogatory email.

- In reference to this Court's temporary injunction, David Brown (CMC's Administrator) instructed CMC medical staff not to worry because, "[w]e know what and who they [the Physicians] are." <u>Exhibit</u> "S."

- Email between CMC representatives regarding the Plaintiffs and stating that the Hindu religion is a "cancer that must be excised." <u>Exhibit</u> "T."

- Plaintiffs were derogatorily referred to at CMC as the "Indians" and the CMC Cardiologists were called the "Cowboys." CMC's board of directors were warned by a former board member (and Dr. Campbell's current counsel) to stop referring to the Plaintiffs as the "Indians" at board meetings, but the board members and the Defendants failed to heed that warning. At no time have Defendants or the board members disciplined anyone for derogatorily referring to the Plaintiffs as the "Indians."

- Defendant Dr. Campbell referred to "the cowboys and the Indians [sic]" in a writing about the Plaintiffs. <u>Exhibit</u> "U." Dr. Campbell also referred to the Plaintiffs in writing as the "Indian cardiologists." <u>Exhibit</u> "V."

- Brown and CMC ordered a CMC security guard to bring a firearm to the hospital (against hospital policy) and stand outside of a meeting with the Plaintiffs in an effort to intimidate the Plaintiffs with physical harm. *See* <u>Exhibit</u> "W."[2]

- Brown stated that he would resolve his dispute with Plaintiffs "the old fashioned way." *See* <u>Exhibit</u> "Y."

Brown's racial animus is well known in the hospital and in the Victoria medical community, as various other minority physicians have also been the focus of his overt racial discrimination. *See* <u>Exhibits</u> "Z", "AA", "BB."

10.    Defendants not only wrote about their extreme racial animus against the Physicians; they acted upon it. For example, despite being board-certified interventional cardiologists with ICD privileges[3] at the other hospital in Victoria (DeTar Hospital), CMC and Brown denied ICD privileges to the Physicians, but granted new privileges to less qualified non-

---

[2]    Brown also apparently ordered that same security guard to remove an African-American gentleman from the county-owned hospital because Brown believed the man was homeless. *See* <u>Exhibit</u> "X."

[3]    An "ICD" or implantable cardioverter defibrillator is a device that can detect abnormal heart rhythms and shock the heart back to its regular rhythm.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

6

Indian physicians.  CMC and Brown also removed Dr. Chandna from the peer review committee for allegedly missing too many meetings; although, Dr. Chandna attended more meetings than any other member besides the chairman.  Defendants' discriminatory misconduct and the intolerable  environment they created also caused Dr. Chandna to resign as the director of the cardiac catheterization laboratory at CMC.  And as discussed below, CMC and Brown inappropriately prevented Plaintiffs from obtaining leadership positions in the hospital because of their race, and they amended various hospital protocols in an inappropriate attempt to force the Physicians out of CMC.  CMC and Brown also hampered Plaintiffs' ability to conduct medical research studies at CMC.  Before 2007, the Physicians enrolled patients in research trials both at CMC and DeTar.  Some of these research trials had more patients at CMC then at DeTar.  Starting late in 2006, Mr. Brown made it difficult for Physicians and their nurses to enroll patients into clinical trials.  On many occasions, nurses were told not to check their patients' records or contact their patients.  Additionally, some patients presented to CMC and requested that the Physicians be called, but CMC did not contact the Physicians.  As a result, Physicians could not enroll patients into trials with existing contracts at CMC; this made it impossible for Physicians to apply for new contracts.  This affected even Physicians out-patient enrollment in their office and some of the trials were terminated at their site due to lack of sufficient patient numbers.

11.    In 2007 and 2008, in an ill-conceived effort to force the Physicians from the hospital, CMC and Brown entered into employment contracts with five non-Indian cardiologists: Drs. Krueger, Tillman, Campbell, Oakley, and Junor (collectively "CMC Cardiologists").  CMC pays the cardiologists more than double the amount they earned in private practice.  Upon

joining CMC, Drs. Tillman and Junor were also paid many thousands of dollars in bonuses. Defendants never conducted a community needs study to determine whether Victoria needed two additional full-time interventional cardiologists. Instead, CMC and Brown hired Drs. Junor and Tillman in an effort to force Plaintiffs out of CMC and overtake their practices.

12.     While Defendants claim they made similar employment offers to the Physicians, such "offers" were a farce. Indeed, the "offers" were a mere afterthought by Defendants in a thinly veiled attempt to convey an appearance of fairness. Further, Defendants certainly did not offer an employment arrangement to Plaintiffs in which they would be paid double the amount they earn in private practice. In any event, Plaintiffs could not have accepted the contracts because they believed those contracts were illegal. In employing the CMC Cardiologists, the Defendants also effectively removed the Plaintiffs from the emergency room call schedule when they agreed only to pay the CMC Cardiologists to take call, Defendants generally only called the Plaintiffs for uninsured patients after the CMC Cardiologists refused to treat them, and Defendants created an intolerable work environment that was untenable for the Physicians to continue taking call.[4] When CMC began employing the CMC Cardiologists, Defendants also deprived the Plaintiffs of their right to read their patients' echocardiogram studies and created an intolerable working environment at CMC.

---

[4]     The "on-call" schedule is designed for unaligned patients, *i.e.*, patients without an established physician relationship. Thus, even though CMC and Brown effectively removed Plaintiffs from the on-call list, Plaintiffs still should have been called when their established patients presented to CMC's emergency room with cardiac problems. However, CMC and Brown failed to even call Plaintiffs for their established patients. This is true even when the patient specifically requested CMC to call the Plaintiffs. This is another example of the disparate treatment Plaintiffs received at CMC. There are more than 100 other physicians at CMC who do not take unaligned emergency room call, but they are called by CMC when their patients present to the emergency room. Further, these physicians were not removed from the hospital because they do not take unaligned emergency room call, nor were they subjected to constant harassment from Defendants.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

13.     In another effort to force the Physicians out of the hospital, CMC, through its administrator, David Brown, arbitrarily and without cause declared that the Physicians were no longer members of the Chest Pain Center Committee.  Brown's removal of the Plaintiffs from the committee was based on his racial animus towards physicians of Indian origin, including his "disgust" and "concern" about physicians of Indian origin obtaining leadership positions in the hospital.  While Brown unilaterally removed the Plaintiffs from the committee for no apparent reason, he permitted the CMC Cardiologists to remain on the committee.

14.     In furtherance of Defendants' goal to remove the Physicians from the hospital, the Defendants amended the STEMI[5] protocol to instruct CMC staff not to call the Physicians when their patients present to CMC's emergency room with a STEMI.  Under the new STEMI protocol, CMC's staff was instructed not to call the Physicians *even when their patients presented at CMC and requested the Physicians*.  This practice has been described by a former emergency room physician at CMC as dangerous and ill-advised.  Defendants also implemented new Chest Pain Center protocols that directed CMC staff to steer Plaintiffs' patients to the Chest Pain Center and subsequently to the CMC Cardiologists.  This has resulted in unnecessary testing for patients and unwarranted medical procedures at CMC.  David Brown instructed his employees and medical staff that, regardless of the patient's cardiologist, "[w]e will refer all such patients to our cardiology group.  Pre established relationship or not." Exhibit "CC."  The amended protocols served three primary purposes: (1) they effectively removed the Physicians from CMC's emergency room; (2) they caused all patients who presented at CMC's Chest Pain Center or emergency room to be treated only by the CMC Cardiologists; and (3) they denied

---

[5]     STEMI stands for ST elevated myocardial infarction.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

other physicians the right to consult with the cardiologist of their choice.  CMC also began paying inappropriate bonuses to its employed emergency room physicians for referring patients away from Plaintiffs and to CMC's Chest Pain Center.  In short, Defendants actively attempted to get rid of the "middle [sic] Eastern" Physicians, as Brown put it, for racially inappropriate reasons.[6]  Defendants implemented the protocols even though they placed patients' lives in danger.[7]

15.    Defendants' discriminatory misconduct did not stop there.  In at least two instances, when the Physicians voiced patient-care concerns to the appropriate hospital departments, CMC initiated peer-review proceedings *against the Physicians*.  Defendants completely ignored the Physicians' patient-care concerns and instead reversed the investigation into one aimed at the Physicians.  CMC and Brown engaged their employed cardiologist and the Physicians' competitor, Dr. Campbell, to provide untrue and defamatory statements against Dr. Chandna and Dr. Gaalla.  This type of reverse-investigation was never undertaken when other physicians lodged patient-care concerns.  This unequal treatment stemmed from discriminatory intent.  Dr. Campbell also made other untrue and defamatory statements to the Executive Committee in an effort to remove the Plaintiffs from the hospital.  While Defendants have alleged since the filing of this lawsuit that Plaintiffs were somehow "disruptive" for raising patient-care concerns and concerns about unnecessary medical procedures at the hospital, CMC's current chief-of-staff, former chief-of-staff, the chairman of the Medical Executive Committee, the former director of the emergency room, the former chief of medicine, and the charge nurse

---

[6]    While geographically incorrect, Brown admitted that by "middle [sic] Eastern born" physicians he was referring to the Plaintiffs.

[7]    As a result of Defendants' discriminatory practices, CMC experienced a *41% increase* in STEMI cases and a 12% increase in the number of patients treated in the Chest Pain Center in 2009. *See* Exhibit "DD."

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

have all testified that Plaintiffs were not disruptive and that they have absolutely no complaints about the Plaintiffs or their clinical abilities.

16.    In yet another effort to remove the Physicians from the hospital for discriminatory reasons, David Brown convinced Dr. Yahagi to cease providing necessary surgical standby for the Plaintiffs.   Without surgical standby, the Plaintiffs could not perform various medical procedures at the hospital, and their patients would instead be steered to the CMC Cardiologists for treatment.   Brown assisted Dr. Yahagi in writing the letter to Plaintiffs informing them that he would no longer provide standby coverage for them. *See* Exhibit "EE."[8]   In advising Dr. Yahagi to cease standby coverage for the Plaintiffs, Brown violated the medical staff bylaws, which require standby coverage.   Brown and CMC failed to correct the dangerous situation until nearly a month later, when the Physicians' counsel demanded adherence to the bylaws.   In the meantime, Defendants permitted patients' lives to be placed in danger in an effort to force the Physicians out of the hospital.   In fact, upon information and belief, at least one patient died as a result of this misconduct.   Brown permitted Dr. Yahagi to continue to provide surgical standby for the CMC Cardiologists.

17.    CMC and Brown also sent an unprecedented and threatening letter to the Plaintiffs in which they criticized the Plaintiffs for referring surgical patients to another facility.[9] A true and correct copy of each of the December 16, 2009 letters to the Physicians are attached

---

[8]    It appears that Brown and Yahagi obtained the idea to pull surgical standby coverage from Dr. Campbell, who advised another cardiac surgeon to pull surgical standby coverage for the Plaintiffs and to "[m]ake it look like you are being forced to resign due to lack of support." Exhibit "II."

[9]    Rather than referring all of their patients to Dr. Yahagi, as Defendants demanded, the Physicians exercised their independent medical judgment in making referrals based on the best interests of their patients. Referrals to Dr. Yahagi are often not in the best interests of the Physicians' patients because Dr. Yahagi has an unusually high mortality rate among heart surgery patients. Dr. Yahagi's mortality rate is at least *twice the national average*, and Plaintiffs have experienced a *40% mortality rate* for the patients they have sent to Dr. Yahagi.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES**
**AND INJUNCTIVE RELIEF**

hereto as Exhibits "FF", "GG", and "HH" and are fully incorporated herein by reference.  Most shocking is the conclusion in the letters demanding responses to the questions about the Physicians' referral patterns to Dr. Yahagi "**so that we may take them into consideration during your reappointment process**." *Id.* (emphasis added).  As CMC described the letters, they ask "very pointed questions regarding [the Physicians'] utilization of Dr. Yahagi's and the hospital's services, patient transfers, and asking whether they should reapply to the Medical Staff."  These letters are so appalling that CMC's current counsel drafted a letter to the Physicians' counsel, after the filing of this lawsuit, in which he futilely attempted to convey that the letters do not mean what they say. *See* Exhibit "JJ."  Defendants and their counsel apparently recognized that CMC's credentialing practices should have been based primarily on quality of care criteria and the Physicians' clinical competence, and not on discriminatory animus.

18.    The December 16, 2009 correspondence is consistent with the same type of harassment the Physicians have received in the past from the Defendants.  For example, on September 18, 2007, CMC's Administrator, David Brown, wrote Dr. Chandna questioning his medical decision to discharge a patient to DeTar Hospital, where the patient underwent a successful bypass surgery.  David Brown similarly initiated harassing and false inquiries about Dr. Gaalla's transfer of a patient to Houston for surgical intervention.  On October 8, 2007, Dr. Parikh received similar correspondence from Brown questioning his admission of a patient to DeTar Hospital even when no such transfer from CMC had occurred.  Brown is not a medical doctor and therefore should not be questioning the Physicians' medical decisions that are based on individual medical evaluations.  Brown has never questioned the CMC Cardiologists or any other physician about their medical decisions to transfer patients.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

19.     On February 17, 2010, Defendants completely revoked the Physicians' privileges. By letter dated February 17, 2010, CMC and Brown's lawyer wrote to the Physicians advising that CMC had passed a resolution barring the Physicians from practicing at CMC.  The letter included an unsigned and undated resolution of the CMC Board of Directors ("Resolution"). The Resolution purports to exclude all physicians from the cardiology department who are not contractually committed to CMC to participate in the on-call emergency room coverage program and precludes those physicians from exercising their clinical privileges at CMC.  A true and correct copy of the February 17, 2010 letter and the Resolution are attached hereto as Exhibit "KK" and are fully incorporated herein by reference.  Drs. Parikh, Chandna, and Gaalla were specifically named in the draft Resolution. *See* Exhibit "LL."  The stated basis for removing the Physicians' privileges is "operational problems."[10]  The stated reason is a pretext.  The Physicians were removed for discriminatory purposes in an effort to force the only cardiologists of Indian origin from the hospital.  The Fifth Circuit has held that, based on the evidence of discrimination in this case, the Resolution is subject to strict scrutiny review.  Because of the overwhelming evidence of Defendants' unrelenting racial discrimination in this case, the Resolution cannot survive such review.

20.     On February 17, 2010, David Brown also sent a memo to all members of the CMC medical staff notifying them of CMC's decision to exclude the Physicians, which took

---

[10]     The Resolution expressly states that it "is not in fact, and should not be interpreted to be, a determination or finding by the Board of incompetent or unprofessional conduct." Exhibit "KK" at p. 2.  Notably, for over a decade, CMC's physician evaluation forms reflect that Plaintiffs obtained the highest possible marks on their CMC evaluations.  However, once the lawsuit was filed, CMC suddenly asserted for the first time ever that Plaintiffs' were somehow "disruptive."   The evaluations lack any details about the alleged "disruption." Defendants' newly alleged claims of "disruption" are simply false, trumped-up claims in retaliation for Plaintiffs filing this lawsuit.  Defendants apparently now consider Plaintiffs' patient-care concerns and concerns about unnecessary and dangerous medical procedures at CMC as "disruptive."

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

immediate effect and set February 24, 2010, as the deadline for the Physicians to cease their cardiology practice and clinical privileges at CMC.  A true and correct copy of the February 17, 2010 memo to the CMC medical staff is attached hereto as Exhibit "MM" and is fully incorporated herein by reference.

21.    Upon information and belief, Dr. Campbell, a competing cardiovascular physician, met with CMC administration and/or the board of directors and promoted CMC's closure of the cardiology department because of his racial animus against the Physicians.  In fact, Campbell outlined in detail his plan, which he called "indain [sic] reflections," to exclude the Plaintiffs from the hospital. *See* Exhibit "II"  He shared his plan with David Brown, and the Defendants executed it with precision.

22.    Defendants' conduct in forcing the Physicians out of the hospital for discriminatory purposes runs directly afoul of the equal protection clause of the United States Constitution.  The equal protection clause prohibits governmental entities from discriminating against persons based on, among other things, their race or national origin.  As a county-owned hospital, it is axiomatic that CMC should be free of all forms of discrimination.  But in this case, Defendants completely ignored that basic constitutional tenant and intentionally discriminated against Drs. Parikh, Chandna, and Gaalla because of their Indian ancestry.

23.    Even after the Court granted the Physician's temporary restraining order directing CMC to permit the Physicians to practice at CMC, Defendant David Brown instructed the director of the emergency room physicians that "PCG [the Physicians] still does not take call *and*

*we don't need to call* [the Physicians]."[11] <u>Exhibit</u> "NN" (emphasis added).  This is just one of many examples of Defendants' flagrant disregard for the law and Plaintiffs' privileges.

24.     In  sum,  when  the  Physicians  refused  to  accept  Defendants'  ongoing discriminatory misconduct, the Defendants retaliated by taking various adverse employment actions against them and ultimately removing them from the medical staff.  The Physicians were inappropriately removed from the medical staff for pre-textual reasons, they were subjected to an extremely hostile environment, and they and were denied their equal protection rights under the Constitution.

## IV.
### CAUSES OF ACTION

### A.     <u>VIOLATION OF EQUAL PROTECTION RIGHTS</u>

25.     The actions of CMC and Brown are state actions that are subject to the provisions of the Equal Protection Clause of the U.S. Constitution and 42 U.S.C. § 1983.  Through the actions described herein, CMC and Brown violated the equal protection rights of the Physicians and thereby violated 42 U.S.C. § 1983.

26.     David Brown and CMC, through its agents, employees, board of directors, and representatives, discriminated against the Physicians on the basis of their race. Defendants' discrimination began manifesting itself in 2007.  Specifically, in May 2007, CMC and Brown arbitrarily denied certain privileges to the Physicians, including ICD privileges, despite the Physicians' ability and credentials to perform those procedures.  At the same time, CMC and Brown granted new privileges to other non-Indian physicians. CMC and Brown failed to treat

---

[11]     Until 2007, the Physicians routinely took emergency room cardiology call at CMC, but stopped when CMC's inequitable treatment became apparent and the intolerable  environment became overwhelming.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES**
**AND INJUNCTIVE RELIEF**

similarly situated persons alike.  CMC and Brown refused to grant privileges to the Physicians—

who are specially trained in the requested procedures and hold the privileges at DeTar

Hospital—and instead granted new privileges to other, non-Indian physicians who were less

qualified.  This unequal treatment stemmed from a discriminatory intent.

27.    The Physicians were routinely referred to at CMC board meetings derogatorily as

"the Indians."    CMC's and Brown's rampant discrimination can be seen in various CMC

correspondence, including among other documents, the following:

- CMC's administrator, David Brown, referred to this case as his "indian [sic] troubles." Exhibit "E";

- "The Inidians [sic] are talking." Exhibit "F";

- "[T]he Indians had been sending the hearts out of town." Exhibit "G";

- "Another year with the Indians." Exhibit "D";

- "I feel a sense of disgust but am more concerned with what this means to the future of the hospital as more of our middle [sic] Eastern born physicians demand leadership roles and demand influence over situations that are hospital issues. . . . . [This] will change the entire complexion of the hospital and create a level of fear among our employees." Exhibit "B."

- In reference to the Court's temporary injunction, David Brown instructed his staff not to worry because, "[w]e know what and who they [the Physicians] are." Exhibit "S."

28.    Defendants' discrimination culminated in CMC entering into employment

contracts with the five non-Indian cardiologists.  CMC's employment of the other cardiologists

put in place the mechanism to effectively force the Physicians out of CMC.  While CMC and

Brown claim they made employment offers to the Physicians, such "offers" were a farce.  The

"offers" were a mere afterthought by CMC in a veiled attempt to convey an appearance of

fairness.  Further, unlike the CMC Cardiologists who were offered and paid more than twice the

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES**
**AND INJUNCTIVE RELIEF**

amount they earned in private practice, CMC and Brown never offered Plaintiffs a contract that would double their earnings.  CMC and Brown's employment of the CMC Cardiologists also caused Plaintiffs to lose their ability to read echocardiograms at CMC, and Plaintiffs stopped receiving call compensation even though the CMC Cardiologists were compensated for call.

29.     In 2009, David Brown arbitrarily and without cause declared that the Physicians were no longer members of the Chest Pain Center Committee.  *See* <u>Exhibit</u> "OO" ("By the way, PCG are no longer members of the committee.").   The CMC Cardiologists were permitted to remain on the committee without explanation.   CMC and Brown did not and cannot offer a legitimate reason for this disparate treatment because this unequal treatment stems from a discriminatory intent.

30.     Brown and CMC further violated the Physicians' equal protection rights when they amended the protocols for the Chest Pain Center and STEMI patients to exclude the Physicians.  Originally, the protocols instructed the staff to notify the Physicians if one of their patients presented to the emergency room or the Chest Pain Center.  However, Brown and CMC subsequently amended the protocols to instruct the staff to only notify the cardiologist "on call," which excludes the Physicians. *See* <u>Exhibit</u> "PP."   David Brown clarified that the protocol amendment means that the Physicians may not be called, *even if their patients request them*. *See* <u>Exhibit</u> "CC" ("We will refer all such patients to our cardiology group.   Pre established relationship or not.").   In fact, CMC and Brown even denied other physicians the right to consult with the Physicians. *See id.* (rejecting Dr. Minocha's request to consult with one of the Physicians).  In one example, an emergency room physician felt uncomfortable denying patients the right to consult the cardiologists of their choice, so she called the Physicians pursuant to a

patient's request.  She was reported to the administration for calling the Physicians and was lambasted by CMC and instructed not to call the Physicians until the patient was out of the Chest Pain Center.  According to her, the CMC Cardiologists were the only cardiologists who were supposed to be called.  This discriminatory act by CMC and Brown also forms the basis of the Physicians' equal protection claim.

31.     In at least two instances, when the Physicians voiced patient-care concerns, CMC and Brown initiated peer review proceedings *against the Physicians*.   Indeed, CMC and Brown completely ignored the Physicians' patient-care concerns and instead flipped the investigation into one aimed at the Physicians.  CMC and Brown engaged their employed cardiologist and the Physicians' competitor, Dr. Campbell, to provide a statement against Dr. Chandna related to Patient T.L. and against Dr. Gaalla related to Patient L.Z.  Dr. Campbell was not a member of the Peer Review Committee and, as a competing physician with racial animus towards the Plaintiffs, he should not have opined regarding the Plaintiffs' care.  Upon information and belief, this type of reverse-investigation was never undertaken when non-Indian physicians lodged patient-care concerns.  This unequal treatment stemmed from a discriminatory intent.

32.     CMC and Brown also removed Dr. Chandna from the peer review committee for no legitimate reason.  CMC's and Brown's purported reason for removing Dr. Chandna from the peer review committee was because of his "frequent absences during the previous year." Exhibit "QQ."  However, aside from the chairman, Dr. Chandna attended the most meetings of any member since the committee's inception.  Dr. Chandna's hospital evaluations reflect that he received the highest marks during that time for meeting attendance.  Notably, there were no peer review committee meetings in the seven months preceding Dr. Chandna's removal from the

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

committee.  Dr. Chandna's removal from the committee is yet another example of CMC's and Brown's unequal treatment and discriminatory intent.    Consistent with this unbridled misconduct, even after the Court enjoined CMC and Brown from precluding the Physicians from practicing at CMC, David Brown instructed the head emergency room physician that "PCG does not take call and we don't need to call [them]." <u>Exhibit</u> "NN."

33.    In addition, Brown advised Dr. Yahagi not to provide surgical standby for the Physicians' patients, despite the bylaw's requirement to do so.  CMC and Brown actively participated in that misconduct and endangered patients' lives.   While Brown and Dr. Yahagi agreed to provide surgical standby for the other cardiologists, they refused to do the same for the Physicians.  Instead of enforcing the bylaws, CMC and Brown enabled Dr. Yahagi to continue his misguided and dangerous practice for nearly a month.  CMC's and Brown's failure to timely correct the situation, enforce the bylaws, and ensure patient care, is another instance of their discriminatory and disparate treatment of the Physicians.

34.    Brown's and CMC's discrimination also manifested in the refusal to appoint Plaintiffs to leadership positions in the hospital.  David Brown documented in his "Memo for Record" his "concern" and "disgust" about physicians of Indian origin obtaining leadership positions in the hospital.  By way of example, Brown refused to permit Dr. Parikh to serve on the executive committee at CMC.   Even though the chief-of-staff recommended Dr. Parikh's appointment to the executive committee, CMC and Brown did not allow this to occur.  Brown was not in favor of the appointment because he did not want physicians of Indian origin in leadership positions, Dr. Parikh was denied the opportunity to serve in that capacity.  CMC and Brown also refused to allow Dr. Chandna to serve as the secretary of the medical staff, even

though he was recommended by the medical staff.   CMC and Brown denied Dr. Chandna the ability to serve in that capacity for pretextual reasons.   Brown claimed that Dr. Chandna lacked the requisite experience to serve in that position, but CMC can point to no formal guidelines to that effect.   Brown simply sought to keep physicians of Indian descent from sitting in positions of leadership at the hospital in accordance with his written "Memo for Record."

35.   CMC and Brown also violated the Physicians' equal protection rights when they passed the Resolution, which precluded the Physicians from practicing at CMC.   Notably, the draft version of the Resolution specifically named Drs. Parikh, Chandna, and Gaalla. *See* Exhibit "LL."   The Resolution treats similarly situated cardiologists disparately, and it has a negative impact on Plaintiffs.   While the other cardiologists continue to enjoy privileges at CMC, the Physicians have been deprived of their privileges at CMC.   The Resolution was inappropriately passed to keep the Physicians out of CMC for discriminatory reasons and retain the other non-Indian cardiologists.   The Resolution, the protocols, and the employment contracts negatively impact the cardiologists of Indian origin at CMC.   The only group that is not negatively impacted by the Resolution, the employment contracts, and the protocols are the CMC Cardiologists, none of whom are of Indian descent.

36.   CMC and Brown also discriminated against the Plaintiffs related to their ability to conduct medical research studies at the hospital.   Prior to 2007, Plaintiffs regularly conducted research studies at CMC.   However, when Defendants began their barrage of discriminatory actions against Plaintiffs, they also refused to permit Plaintiffs to conduct such studies at CMC and created such an intolerable environment at the hospital that those studies were unfeasible.

37.     The Physicians contend that this pattern of misconduct and disparate treatment by Defendants was motivated by intentional discrimination on the basis of race and created an extremely hostile environment.   Further, Brown and CMC's unequal treatment of Plaintiffs vis-à-vis the other cardiologists was motivated by a totally illegitimate animus and ill-will towards the Physicians.  Plaintiffs seek all damages and remedies afforded under the law for Defendants' misconduct.

## B.     TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

38.     Dr. Campbell tortiously interfered with the Physicians' contractual relations with CMC and their patients.  Dr. Campbell attended Dr. Gaalla's peer review meeting to complain to the committee about Dr. Gaalla's alleged misconduct when Dr. Campbell was not a member of the peer review committee.  Additionally, Dr. Campbell made a presentation to the Medical Executive Committee ("MEC") of CMC on January 12, 2010, and willfully and intentionally made false representations to the MEC concerning the Physicians, including the misrepresentation that the Physicians were creating problems for Dr. Yahagi without just cause. In reality, the Physicians were refusing to use Dr. Yahagi due to his poor patient outcomes. Based on information and belief, Dr. Campbell's presentation to the MEC on January 12, 2010, lasted approximately 20 minutes.  Finally, Dr. Campbell wrote in patient J.B.'s chart that Dr. Parikh did not have privileges to perform the procedure the patient needed, when Dr. Parikh did in fact have the requisite privileges.

39.     In addition, Dr. Campbell willfully and intentionally misrepresented to CMC that the Physicians provided poor medical care to patients.  For example, Dr. Campbell tortiously interfered with Plaintiffs' relationship with CMC when he misrepresented to CMC the quality of

care provided to patient T.L.  This was a case in which Dr. Chandna complained about the treatment (or lack thereof) provided to patient T.L., but Dr. Campbell turned the entire investigation into one focused on Dr. Chandna's treatment of the patient.   This was highly improper since Dr. Chandna's care was appropriate.  Dr. Campbell presented this case and critiqued Dr. Chandna's patient care at a CMC Chest Pain Center Committee meeting in November 2009.   As another example of Dr. Campbell's interference, Dr. Campbell inappropriately involved himself in an assessment of Dr. Gaalla's treatment of patient L.Z.  This was another instance of the Physicians asserting a concern about patient care and the investigation being turned around to focus on them.  In the case of patient L.Z., Dr. Campbell wrote a letter dated June 18, 2009, in which he inappropriately and unfairly attacked the care provided by Dr. Gaalla.  In December 2009, Dr. Campbell also inappropriately interjected himself into a review of Dr. Parikh's transfer of patient W.G.  Dr. Campbell continued this pattern of inappropriate interference with patient K.P. in August 2009, in which he unjustly criticized in writing Dr. Chandna's care and transfer of patient K.P.  Because Dr. Campbell is a direct competitor of the Plaintiffs and is in a position to gain financially from such intervention, it is highly inappropriate for him to interject himself in these cases and interfere with the Plaintiffs' relations with CMC and their patients.

40.    Dr. Campbell went so far as to ask CMC to advertise for him in competition with the Physicians.  Dr. Campbell pulled CMC's advertising agent aside and noted that "more and more often, Parikh's and Galla's [sic] patients were coming to him and [Cardiovascular Associates Victoria], because it was 'like a factory over there.'"  Exhibit "RR."  Dr. Campbell asked CMC to think about the advertising potential of this against the Physicians.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

41.     Dr. Campbell further interfered with the Physicians' contractual relations when he requested CMC to insert various inappropriate provisions in the Physicians' reappointment agreement and to shorten the reappointment to a year.   Specifically, on March 30, 2010, Dr. Campbell wrote to David Brown and encouraged him to place restrictions on Dr. Chandna's privileges at CMC and alter the parties' contract. *See* Exhibit "SS."   Dr. Campbell even proposed contractual language for Dr. Chandna's reappointment.   Dr. Campbell further stated, "I also think it is important to make his re-appointment for only one year."   This is contrary to CMC's two-year appointment period.

42.     Dr. Campbell's misconduct contributed to CMC awarding Dr. Campbell and other cardiologists the exclusive right to practice cardiology at CMC, thereby excluding the Physicians' practice there.   Additionally, Dr. Campbell's inappropriate actions had the direct effect of interfering with the Physicians' patients, including Patients J.B., L.Z., and T.L.   Several of the Physicians' patients have presented to CMC and were told that the Physicians no longer practice there or no longer had privileges there.   Those patients were steered to the competing cardiologists at CMC.   This inappropriate steering of the Physicians' patients will likely continue in the future and cause further actual damage or loss.

## C.     TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

43.     Dr. Campbell tortiously interfered with the Physicians' prospective relations with their future patients expected to present to CMC.   Specifically, there is a reasonable probability that the Physicians would have entered into a relationship with certain cardiac patients but for Dr. Campbell's tortious interference.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

44.     Dr. Campbell's misrepresentation in Patient J.B.'s medical chart indicating that Dr. Parikh did not have privileges to perform the procedure needed by Patient J.B. was an independently tortious act that amounts to fraud.  Specifically, Dr. Campbell made a material misrepresentation concerning Dr. Parikh's privileges at CMC and Dr. Parikh's ability to treat Patient J.B.  Dr. Campbell's actions were intended to induce Patient J.B. to become Dr. Campbell's patient and further steer Patient J.B. to Dr. Yahagi, the exclusive cardiac surgeon at CMC.

45.     Dr. Campbell's interference proximately caused the Physician's injuries and actual damage or loss.

## D.   **DEFAMATION**

46.     Dr. Campbell published a statement of fact in patient J.B.'s medical chart stating that Dr. Parikh did not have privileges to perform the procedure needed by patient J.B.  Dr. Campbell's statement was verifiably false and defamatory.   Dr. Campbell's defamatory statements were made with actual knowledge of falsity or reckless disregard for the truth.  Upon information and belief, Dr. Campbell also communicated and published this defamatory statement of fact to patient J.B without justification or excuse.  Dr. Campbell's defamatory statement injured Dr. Parikh's reputation and thereby exposed him to financial injury and impeached his integrity, virtue, and reputation.  Dr. Campbell's defamatory statement constitutes statutory libel per se. *See* TEX. CIV. PRAC. & REM. CODE § 73.001.  Additionally, Dr. Campbell's defamatory statement is libel per se because it injures Dr. Parikh's occupation as a cardiologist.  Further, Dr. Campbell's defamatory statement to patient J.B. is slander per se because it injures

Dr. Parikh's business reputation.  Alternatively, Dr. Campbell's defamatory statements constitute defamation by innuendo or implication and are therefore actionable.

47.    Dr. Campbell also defamed Dr. Chandna in a correspondence dated March 26, 2010.  In that correspondence, Dr. Campbell stated that Dr. Chandna:

> has repeatedly been dishonest by deliberately deceiving patients in his representation of CMC and Dr. [Yahagi].  His actions and counsel to patients are intentionally deceptive, misleading and, [sic] inflammatory.  He has grossly miss represented [sic] the facts and consequently inflamed patient emotion and encouraged a negative opinion toward CMC.  This seditious speech and subversive actions toward [Dr. Yahagi] and CMC is deliberate and calculated.  The purpose is to undermine CMC cardiovascular program.  These rabble-rousing behaviors are very disruptive to general medical care and are a poor reflection on Victoria medical community as a whole.

Exhibit "TT."  This statement is verifiably false and defamatory.  Dr. Campbell's defamatory statements were made with actual knowledge of falsity or reckless disregard for the truth.  Dr. Campbell's defamatory statement injured Dr. Chandna's reputation and thereby exposed him to financial injury and impeached his integrity, virtue, and reputation.  Dr. Campbell's defamatory statement constitutes statutory libel per se. *See* TEX. CIV. PRAC. & REM. CODE § 73.001. Additionally, Dr. Campbell's defamatory statement is libel per se because it injures Dr. Chandna's occupation as a cardiologist.   Alternatively, Dr. Campbell's defamatory statements constitute defamation by innuendo or implication and are therefore actionable.

48.    Dr. Campbell defamed Dr. Gaalla in correspondence dated June 18, 2009 addressed to Dr. Weiner and the peer review committee.  Specifically, Dr. Campbell made the following defamatory statements about Dr. Gaalla in response to a patient care concerns *raised by Dr. Gaalla*:

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

On review of Mr. [L.Z's] case I discovered numerous major concerns regarding Dr. Gaalla's general cardiac care and management. These include; [sic]

1. Recurrent deviations from the standard of care outlined by the ACC/AHA guidelines

2. Failure to deliver correct therapy

3. Inappropriate procedures

4. Incorrect diagnosis

5. Fabrication of information

6. Poor catheterization technique

49. Dr. Campbell's statements about Dr. Gaalla are false and defamatory. Dr. Campbell's defamatory statements were made with actual knowledge of falsity or reckless disregard for the truth. Dr. Campbell's defamatory statement injured Dr. Gaalla's reputation and goodwill, thereby exposing him to financial injury and impeached his integrity, virtue, and reputation. Upon information and belief, Dr. Campbell also communicated and published these defamatory statements of fact to members of the peer review committee and employees and representatives of Confidential Peer Review, Ltd. without justification or excuse. Dr. Campbell's defamatory statement injured Dr. Gaalla's reputation and thereby exposed him to financial injury and impeached his integrity, virtue, and reputation. Dr. Campbell's defamatory statement constitutes statutory libel per se. *See* TEX. CIV. PRAC. & REM. CODE § 73.001. Additionally, Dr. Campbell's defamatory statements are libel per se because it injures Dr. Gaalla's occupation as a cardiologist. Alternatively, Dr. Campbell's defamatory statements constitute defamation by innuendo or implication and are therefore actionable.

50.     With regard to the truth of his statements, Dr. Campbell is liable without regard to fault (strict liability).  Alternatively, Dr. Campbell was acting negligently or with actual malice with regard to the truth of his statements.  The Physicians' damages are presumed by law. Further, the Physicians suffered pecuniary injury, including actual damages, loss of past and future income, loss of earning capacity, damages for injury to their reputation, personal humiliation, and mental anguish and suffering.  In addition, because Dr. Campbell's defamatory statements were made with malice, the Physicians are entitled to exemplary damages.

E.     **APPLICATION FOR INJUNCTIVE RELIEF**

51.     The Physicians seek a preliminary and permanent injunction against Defendants consistent with the terms of the Court's original preliminary injunction; although the preliminary and permanent injunction would be based on equal protection and not due process violations. Specifically, the Physicians ask this Court to preliminarily and permanently enjoin Defendants from implementing the Resolution and limiting the Physicians' exercise of their hospital privileges to provide care and treatment to their patients at CMC.

52.     If the Physicians' request for preliminary and permanent injunctive relief is not granted, immediate and irreparable injury, loss, and damage will result to the Physicians. Specifically, CMC and Brown have indicated in the February 17, 2010 memorandum to all members of the CMC medical staff that the closing of the cardiology department was effective immediately and that the Physicians would not be able to attend to any current inpatients after February 24, 2010.  If Defendants are not enjoined from closing the cardiology department and preventing the Physicians from treating their patients who routinely present to CMC and/or who are admitted to CMC, immediate and irreparable injury, loss and damage to Physicians (as well

as their patients) will occur.  Specifically, the Physicians will be precluded from treating their cardiology patients who are admitted to CMC.  This will result in the loss of some or all of these patients as well as cause irreparable harm to the Physicians' goodwill with their patients and reputation in the medical community.  Additionally, their patients will be deprived of their right to select the physician of their choice.  There is no adequate remedy at law to alleviate the risk of injury and loss other than that sought by this application.  As set forth above, the Physicians are likely to prevail on their equal protection claims in this case.

53.    Further, as Defendants' conduct establishes, a real and immediate threat that injuries against the Physicians described above will continue or be repeated unless a permanent injunction is granted to enjoin Defendants from implementing the Resolution and limiting the Physicians' exercise of their hospital privileges at CMC.  Specifically, despite this Court's ruling and CMC's and Brown's assertions to the contrary, the Resolution has been implemented by CMC and at CMC's and Brown's direction to the applicable medical staff and continues to be implemented.[12]

54.    This application for a preliminary injunction and permanent injunction is supported by the verifications of Drs. Parikh, Chandna, and Gaalla.

## V.
## DAMAGES

55.    The Physicians have been significantly damaged and continue to incur significant damages as a result of the Defendants' acts and omissions set forth above.  The Physicians' damages caused by Defendants' acts and omissions include actual damages, injury to their

---

[12]    While Physicians are seeking lost profit damages, those economic damages do not and cannot adequately compensate Physicians for the injuries incurred by Defendants misconduct for which Physicians seek this injunctive relief.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES**
**AND INJUNCTIVE RELIEF**

reputation among their patients, within the community and within the medical profession, lost earnings, lost earning capacity, loss of market share, loss of research study funds, loss of business, loss of goodwill, unjust enrichment, loss of benefits of contracts, and consequential damages, including but not limited to mental anguish and all emotional distress damages.   In addition, the Physicians seek exemplary damages for the Defendants' violations of 42 U.S.C. § 1983 in that the Defendants' conduct was motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of others.   Finally, the Defendants' tortious interference with existing contracts and prospective relations and defamatory remarks as set forth herein were reckless, malicious, and knowing, which also allows for the recovery of exemplary damages.  The Defendants are jointly and severally liable for the damages.  The Plaintiffs seek all recoverable damages and remedies, in law and equity, against Defendants to the fullest extent permitted by law.

## VI.
## ATTORNEYS' FEES

56.    The Physicians have been required to retain legal counsel to prosecute this action against the Defendants.[13]   The Physicians' attorneys' fees, expenses, and costs are recoverable pursuant to their claims under 42 U.S.C. § 1983, and Plaintiffs seek all such fees and expenses. The Physicians seek to recover their attorneys' fees, expenses, and costs incurred in prosecuting this matter in this U.S. District Court, any appeals to Fifth Circuit Court of Appeals and U.S. Supreme Court, as well as any certification to the Texas Supreme Court.

---

[13]    The attorneys' fees, expenses, and costs incurred in prosecuting the Physicians' equal protection cause of action are, at least in part, inextricably intertwined with the state law causes of action against Dr. Campbell and the other federal causes of action that have been dismissed.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

# VII.
## JURY DEMAND

57.    The Physicians hereby demand a trial by jury for all issues which are triable to a jury.

# VIII.
## PRESERVED CLAIMS

58.    Plaintiffs previously asserted and continue to assert substantive and procedural due process and equal protection claims under 42 U.S.C. § 1983 against CMC, Donald Day, Joe Bland, Andrew Clemmons, M.D., Jennifer Hartman, Paul Holm, and Luis Guerra (collectively "Board Member Defendants") and Brown.  However, because the Board Member Defendants and Brown have been dismissed by the Court based on absolute immunity, and the Fifth Circuit found qualified immunity for said individuals based on the due process claims, Plaintiffs do not discuss those claims in this complaint.  Plaintiffs do, however, retain and do not waive any and all rights to appeal the dismissal of the Board Member Defendants and Brown at the appropriate time.

59.    Plaintiffs' procedural and substantive due process claims against all Defendants have been dismissed and therefore those claims are not discussed herein.  Plaintiffs do, however, retain and do not waive any and all rights to appeal the dismissal of the substantive and procedural due process claims against all Defendants at the appropriate time.  Plaintiffs similarly retain and do not waive their contention that the CMC Cardiologists' employment contracts with CMC violate the prohibition on the corporate practice of medicine and are therefore void.[14]

---

[14]    Plaintiffs allege that the employment contract between Dr. Campbell and CMC is illegal and invalid.  Since Dr. Campbell is not and cannot be an employee of CMC, he is not afforded immunity under the Texas Tort Claims Act.  While Plaintiffs respect Judge Jack's ruling that the employment agreement is legal, they respectfully disagree and intend to appeal it at the appropriate time.  Dr. Campbell should not be entitled to

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

## IX.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Physicians request a preliminary injunction and that, upon final trial, a permanent injunction be issued consistent with the terms set forth above; and that the Physicians be awarded judgment against Defendants for the following:

(a)    all damages as requested in Section V hereof and/or all damages permitted by law or equity within the jurisdictional limits of the Court;

(b)    exemplary damages and/or punitive damages as requested above and/or as permitted by law, as found by the trier of fact;

(c)    pre-judgment and post-judgment interest at the highest lawful rates;

(d)    all reasonable and necessary attorneys' fees, costs, and expenses incurred in the prosecution of this suit;

(e)    all costs of court; and

(f)    all other relief, in law or equity, special or general, to which Plaintiffs may be entitled.

---

immunity because he cannot be an employee of CMC, since his employment contract violates the prohibition on the corporate practice of medicine and is therefore void. The prohibition on the corporate practice of medicine is found in the Texas Medical Practice Act. Dr. Campbell's employment contract with CMC does not fit within any statutory exception. There are several specific statutory enactments that allow certain governmental hospitals to directly hire physicians. CMC has not obtained any such statutory enactment. Accordingly, Plaintiffs contend that CMC may not directly employ Dr. Campbell.

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Respectfully submitted,

JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000 (Telephone)
(512) 236-2002 (Facsimile)

By:   /s/ Monte F. James
      Monte F. James
      *Attorney-in-Charge*
      State Bar No. 10547520
      Southern District Bar No. 29591
      Joshua A. Romero
      State Bar No. 24046754
      Southern District Bar No. 725205

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing instrument was served on all attorneys of record in the above entitled and numbered cause this the 28th day of September, 2012, via the following:

```
_____   Certified Mail, Return Receipt Requested
_____   Regular Mail
_____   Facsimile
_____   Overnight Delivery
___✓___    Electronic Delivery
```

Daniel M. McClure
Lance R. Bremer
Fulbright & Jaworski L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010

Rex Easley, Jr.
Cole Cole Easley PC
302 W. Forrest
Victoria, Texas 77901

Darrell Barger
Hartline, Dacus, Barger, Dryer & Kern, L.L.P.
800 North Shoreline Blvd., Suite 2000
Corpus Christi, Texas 78401

Kevin D. Cullen
Cullen, Carsner, Seerden & Cullen, L.L.P
P.O. Box 2938
119 S. Main Street
Victoria, Texas 77902-2938

                            Monte F. James
                            Monte F. James

8511796v.1

**PLAINTIFFS' FOURTH AMENDED VERIFIED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

## VERIFICATION

STATE OF TEXAS            §
                         §
COUNTY OF VICTORIA       §

ON THIS DAY, Dakshesh "Kumar" Parikh, M.D., personally appeared before me, the undersigned notary public, and after being duly sworn stated under oath that he is one of the named plaintiffs in the foregoing Complaint; that he has read the above and foregoing Plaintiffs' Fourth Amended Verified Complaint for Damages and Injunctive Relief; and that every statement contained in Paragraphs 7-20, 22-24 and 51-54 of the Complaint is within his personal knowledge and is true and correct.

_____
Dakshesh "Kumar" Parikh, M.D.

SUBSCRIBED AND SWORN TO BEFORE ME on this the 25 day of September, 2012.

KATINA YVETTE ROBERSON
Notary Public, State of Texas
My Commission Expires
July 08, 2014

_____
Notary Public in and for the State of Texas

## VERIFICATION

STATE OF TEXAS      §
                      §
COUNTY OF VICTORIA    §

ON THIS DAY, Harish Chandna, M.D., personally appeared before me, the undersigned

notary public, and after being duly sworn stated under oath that he is one of the named plaintiffs

in the foregoing Complaint; that he has read the above and foregoing Plaintiffs' Fourth Amended

Verified Complaint for Damages and Injunctive Relief; and that every statement contained in

Paragraphs 7-20, 22-24 and 51-54 of the Complaint is within his personal knowledge and is true

and correct.



Harish Chandna, M.D.


SUBSCRIBED AND SWORN TO BEFORE ME on this the _2.5_ day of September,

2012.

Notary Public in and for the State of Texas

KATINA YVETTE ROBERSON
Notary Public, State of Texas
My Commission Expires
July 08, 2014

## VERIFICATION

STATE OF TEXAS      §
                             §
COUNTY OF VICTORIA    §

ON THIS DAY, Ajay Gaalla, M.D., personally appeared before me, the undersigned

notary public, and after being duly sworn stated under oath that he is one of the named plaintiffs

in the foregoing Complaint; that he has read the above and foregoing Plaintiffs' Fourth Amended

Verified Complaint for Damages and Injunctive Relief; and that every statement contained in

Paragraphs 7-20, 22-24 and 51-54 of the Complaint is within his personal knowledge and is true

and correct.



Ajay Gaalla, M.D.

SUBSCRIBED AND SWORN TO BEFORE ME on this the 25 day of September,

2012.

KATINA YVETTE ROBERSON
Notary Public, State of Texas
My Commission Expires
July 08, 2014

Notary Public in and for the State of Texas