**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| **HARISH CHANDNA, M.D.,** | § | |
| **DAKSHESH "KUMAR" PARIKH,** | § | |
| **M.D., and AJAY GAALLA, M.D.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 6:10-cv-00014** |
| **CITIZENS MEDICAL CENTER,** | § | |
| **DAVID P. BROWN, and** | § | |
| **WILLIAM TODD CAMPBELL,** | § | |
| **JR., M.D.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY AND
OPINIONS OF PLAINTIFFS' PROPOSED DAMAGES EXPERTS,
RONALD T. LUKE AND THOMAS W. GLASS**

Pursuant to Rules 402, 403, and 702 of the Federal Rules of Evidence and

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), defendants Citizens

Medical Center ("CMC"), David P. Brown, and William Todd Campbell, Jr., M.D.

(collectively, "Defendants") move to exclude the testimony and opinions of the

plaintiffs' proposed damages experts, Ronald T. Luke and Thomas W. Glass.  In

support of this motion, Defendants would respectfully show the Court the

following:

90799140.1

**INTRODUCTION**

Plaintiffs Harish Chandna, M.D., Dakshesh "Kumar" Parikh, M.D., and Ajay Gaalla, M.D. (collectively "Plaintiffs") have designated economist Ronald T. Luke and accountant Thomas W. Glass as expert witnesses to testify about damages.  To this end, Luke and Glass issued reports dated September 11, 2012, in which they purport to quantify the following alleged "damages" that they contend Plaintiffs have suffered or will suffer over the sixteen year period from 2007 to 2022:

   (1)   "lost profits" arising from alleged declines in Plaintiffs' annual new patient loads (approximately $10.35 million);

   (2)   "lost profits" arising from Plaintiffs' loss of former patients whom CMC allegedly "steered" to the care of its own employed cardiologists (approximately $385,000 – $392,000);

   (3)   lost revenues consisting of unpaid amounts for on-call service at CMC, an activity Plaintiffs stopped performing in 2007 (approximately $2.23 million); and

   (4)   "lost profits" arising from alleged declines in the number of CMC patients enrolled in Plaintiffs' medical research studies (approximately $3.26 million).[1]

All of the foregoing damages claims include a future damages component based upon the assumption that wrongful conduct will occur in the future and cause

---

[1] *See* Sept. 2012 Luke Report at ¶¶ 54-56, 57-64, 65-74; Sept. 2012 Glass Report at pp. 4-6, 6-8, 11-12, 13-14.  Copies of Luke's and Glass's September 11, 2012 reports are attached hereto as **Exhibits A** and **B**, respectively.  The exhibits have been highlighted to show the portions of the reports stricken by the Court in its Order signed October 12, 2012.  *See* Dkt. 374.  The un-highlighted portions are what remains of the reports following the Court's Order.

damages in the future (through 2022).  The alleged future damages account for some $10.7 million of the total claimed damages of $16.2 million.[2]

As their reports indicate, Luke and Glass observe a strict division of labor. Luke, using patient billings and collections data, purports to quantify the alleged decline in the number of new patients seen by Plaintiffs and the average dollar value of a new patient to Plaintiffs; to identify "steered" patients and corresponding collections by CMC for services performed on them; and to quantify the revenues allegedly lost due to an alleged decline in the number of CMC patients enrolled in medical research studies conducted by Plaintiffs.[3]  Luke also purports to opine about causation, stating that the actions of "Brown and his subordinates," as alleged by Plaintiffs in their amended complaint, "could have" caused all of Plaintiffs' alleged loss of new and existing patients, and part or all of the alleged decline in enrollees in medical research studies.[4]  Glass relies heavily upon Luke's work, and more or less picks up where Luke leaves off and calculates "lost profits."[5]  Glass also aggregates past and future on-call payments.[6]

---

[2] *See* Sept. 2012 Glass Report, Ex. B, at pp. 5, 7-8, 11-12, 13-14.

[3] Sept. 2012 Luke Report, Ex. A, at ¶¶ 54-74.

[4] *Id.* at ¶¶ 109-11.

[5] *See* Sept. 2012 Glass Report, Ex. B, at pp. 4-14.

[6] *Id.* at pp. 11-12.

As the Court is aware, Luke and Glass originally issued reports in this case on November 18, 2010, shortly before they were deposed.  Those original reports claimed *more than $43 million* in damages.[7]  A month later, on December 16, 2010, after their depositions, Luke and Glass issued revised reports making certain "corrections" that reduced the damages claims to $16.5 million.[8]  Shortly thereafter, CMC's expert, G. Don Barbo, issued a report criticizing Luke's and Glass's methodologies and pointing out serious defects in the reliability of their damages opinions.[9]  In September 2012, Luke and Glass issued their latest revised reports.

Pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), Defendants now move to exclude the testimony and opinions of Luke and Glass in their entirety.  The bases for exclusion are as follows:

- Luke's and Glass's opinions regarding alleged lost new patients are irrelevant and unreliable because (1) there is no plausible connection between Plaintiffs' alleged loss of new patients and the alleged adverse actions that form the basis of Plaintiffs' claims in this lawsuit,

---

[7] *See* Nov. 2010 Glass Report at p. 15.  Copies of Luke's and Glass's November 18, 2010 reports are attached hereto as **Exhibits C** and **D**, respectively.

[8] *See* Dec. 2010 Glass Report at p. 16.  Copies of Luke's and Glass's December 16, 2010 corrected reports are attached hereto as **Exhibits E** and **F**, respectively.

[9] *See* Barbo Report.  A copy of Barbo's December 28, 2010 report is attached hereto as **Exhibit G**.  As Barbo explains in an affidavit attached hereto as **Exhibit H**, the December 2010 report reflects his opinions and professional analysis and is applicable to Luke's and Glass's September 2012 reports as well as their earlier reports.  *See* Barbo Aff., **Ex. H**.

and (2) other reasons besides Defendants' alleged conduct likely account for any decline in Plaintiffs' new patient loads, and Luke's opinion that Brown's and CMC's alleged wrongful conduct is the cause is based on nothing more than assumptions and speculation;

- Luke's and Glass's opinions regarding alleged "steered" patients are irrelevant and unreliable because Luke did no work to investigate the reasons why any particular "steered" patient saw a CMC cardiologist as opposed to Plaintiffs, but instead simply speculates that every patient who saw a CMC cardiologist after previously seeing Plaintiffs did so because of improper "steerage";

- Glass's opinions regarding on-call payments are irrelevant and unreliable because there is no valid claim in this case for unpaid amounts for on-call service at CMC, which Plaintiffs never even performed;

- Luke's and Glass's opinions regarding research studies are irrelevant and unreliable because (1) there is no plausible connection between the alleged decline in CMC patient enrollees in Plaintiffs' studies and the alleged adverse actions that form the basis of Plaintiffs' claims in this lawsuit, and (2) the claimed damages arising from the alleged decline in CMC patient enrollees are speculative; and

- Independent of the foregoing, there is absolutely no legal basis for recovering future damages premised on the speculative assumption that Defendants will engage in wrongful and injurious conduct in the future.

## STANDARD OF REVIEW

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that trial courts are required to serve as evidentiary "gatekeepers" and must conscientiously screen expert testimony for relevance and reliability. *Id.* at 597. A court should exclude the testimony of an expert if it does not meet the appropriate standards. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999);

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).   As the Supreme Court recognized in *Daubert*, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and therefore, the trial court should exercise "more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

For the expert's testimony to be admissible, the Federal Rules of Evidence dictate that (i) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," (ii) the expert must be "qualified as an expert by knowledge, skill, experience, training, or education," and (iii) the testimony must meet the following requirements: (1) the expert's testimony must be based on sufficient facts or data, (2) the expert's testimony must be the product of reliable principles and methods, and (3) the expert must apply the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  "Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."  *Daubert*, 509 U.S. at 590.  An expert cannot connect existing data to his opinions by his mere *ipse dixit*.  *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Furthermore, an expert's testimony cannot be based on mere subjective belief or unsupported speculation.  *Daubert*, 509 U.S. at 590.

Once a movant challenges an expert's testimony, the burden shifts to the party offering the expert to prove by a preponderance of the evidence that the

expert's testimony is reliable and relevant.  *Flores v. Allstate Tex. Lloyd's Co.*, 229 F. Supp. 2d 697, 701 n.5 (S.D. Tex. 2002) (citing *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999)); *see also Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002) ("The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test.").  The party who proffers an expert's testimony bears the burden of establishing each of the Rule 702 requirements – relevance, qualifications, and reliability – by a preponderance of proof.  *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 580-581 (5th Cir. 2001).

An expert opinion is reliable only if it is grounded in the methodology of his relevant discipline and is the product of reliable principles and methods.  *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 583-584, 587 (5th Cir. 2004)[10].

In ruling on the admissibility of expert opinion evidence, the district court has broad discretion, and "[t]he exclusion of expert evidence is to be sustained unless manifestly erroneous."  *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 427 (5th Cir. 1986) (citing *Salem v. United States Line Co.*, 370 U.S. 31, 35 (1962)).

---

[10] A *Daubert* motion against Dr. Luke was granted in another case in which Dr. Luke's statistical analysis was held to be inadmissible because of "several serious methodological flaws." *Coleman v. Exxon Chemical Corp.*, 162 F.Supp. 2d 593, 620-21 (S.D. Tex 2001).

## ARGUMENT AND AUTHORITIES

**I.      Luke's And Glass's Opinions Are Inadmissible And Should Be Excluded In Their Entirety.**

For all of their claims of injury, all three of the Plaintiffs consistently maintained pre-tax income levels well above the 90th percentile for invasive-interventional cardiologists in 2007 and later years.[11]   Thus, Luke and Glass do *not* attempt to calculate *actual* lost revenue and net profits during 2007-2012 compared to prior years.   Instead, the damages "experts" chose to focus with tunnel vision on four specific categories of hypothetical incremental revenues as alleged damages, rather than on Plaintiffs' actual economic conditions.

As discussed below, the opinions and calculations offered by Luke and Glass with respect to each of the four categories of damages claimed by Plaintiffs are irrelevant, unreliable, and inadmissible in their entirety, and the Court should accordingly exclude the opinions and calculations and preclude Luke and Glass from testifying at trial.

### A.      Luke's And Glass's Opinions Regarding Alleged Loss Of New Patients Are Irrelevant And Unreliable.

Together, Luke and Glass opine that Plaintiffs have suffered or will suffer more than $10 million in damages due to a decline in new patients.   This "lost new

---

[11] Barbo Report, Ex. G, at pp. 32-33.   Barbo concluded that the minimal reduction in actual income after 2006 was accounted for by lower collection rates and higher operating expenses. *Id.* at 33.

patients" opinion is premised on Luke's examination of records from Plaintiffs' billing system, which Luke contends show that the number of new patients seen by Plaintiffs has declined each year since 2006 at three particular practice locations— CMC, Plaintiffs' office, and various hospitals or clinics outside Victoria denoted by Luke as "other."[12]  As a further basis for the opinion, Luke opines—and Glass accepts—that the actions of CMC and Brown as alleged by Plaintiffs in their amended complaint are the cause of the *entirety* of the decline in new patients at all locations.[13]  Ultimately, Luke and Glass arrive at their $10 million-plus damages figure by treating 2006 as a "base" year that supposedly establishes the number of new patients Plaintiffs should see *every* year (through 2022), and by calculating the alleged "lost profits" attributable to the "loss" or expected "loss" of new patients below this baseline for each year.[14]

As discussed below, the Court should exclude Luke's and Glass's opinions regarding Plaintiffs' alleged loss of new patients because they are irrelevant, speculative, and unreliable.

---

[12] Sept. 2012 Luke Report, Ex. A, at ¶¶ 54-55 and Figs. 10, 22; *see also* Sept. 2012 Glass Report, Ex. B, at p. 5 and Attachment 5.

[13] Sept. 2012 Luke Report, Ex. A, at ¶ 109; Sept. 2012 Glass Report, Ex. B, at p. 4.

[14] *See* Sept. 2012 Luke Report, Ex. A, at ¶¶ 54-56; Sept. 2012 Glass Report, Ex. B, at pp. 4-5.

### 1.  The Lost New Patient Opinions Are Not Linked To The Actual Claims In This Case.

The Court should exclude Luke's and Glass's opinions regarding lost new patients because they are irrelevant to the actual liability claims in this case.  As the Court is aware, the sole remaining claim against CMC and Brown is a race-based equal protection claim premised upon (1) CMC's passage of a Resolution in 2010 that limited the exercise of cardiology privileges at CMC to those physicians under contract with the hospital, and (2) a series of alleged adverse actions by Brown, which were listed by the Fifth Circuit in its February 2012 opinion in this case.[15]  The claims against Dr. Campbell allege that Dr. Campbell tortiously interfered with but a single prospective patient relationship—with patient "J.B."— and mainly complain about statements allegedly made by Dr. Campbell to CMC, Brown, or to the medical executive and peer review committees.[16]

Simply put, there is no plausible connection between the alleged actions that form the basis of Plaintiffs' claims and Plaintiffs' alleged loss of new patients beginning in 2007.  Indeed, the Resolution has never been implemented, and Plaintiffs continue to exercise their privileges at CMC to this day.  Moreover, the Resolution was not adopted until 2010, three years after Plaintiffs claim their new

---

[15] *See* Pltf. 4th Am. Complaint, Dkt. 362, at ¶¶ 25-37; *Gaalla v. Brown*, 460 F. A'ppx 469, 479 (5th Cir. 2012) (listing the alleged adverse actions by Brown that form the basis of Plaintiffs' claims against him).

[16] *See* Pltf. 4th Am. Complaint, Dkt. 362, at ¶¶ 43-44; 38-50.

patient numbers began to decline.  As for the alleged actions by Brown, they concern matters, such as committee assignments and hospital procedures, that would have no effect on Plaintiffs' ability to acquire new patients—particularly at the *non*-CMC locations, where Luke and Glass allege that Plaintiffs lost the most new patients and suffered the most damages (nearly $7 million out of the total $10.35 million claim).[17]  Finally, as indicated, Plaintiffs charge Dr. Campbell with the potential loss of just a single prospective patient, and indeed, Luke does not even identify any alleged actions by Dr. Campbell in his report when opining about the alleged cause of Plaintiffs' purported decline in new patients.[18]  Luke admitted at his deposition that he has made no determination of what losses or damages, or what lost patients, were caused by any of the specific actions of the Defendants alleged in the Complaint.[19]

Courts have repeatedly stricken expert testimony when it failed to "accurately link the alleged damages to the torts."  *MicroStrategy Inc. v. Bus. Objects*, S.A., 429 F.3d 1344, 1355, 1356 (Fed. Cir. 2005).  In *MicroStrategy*, the

---

[17]  *See* Sept. 2012 Glass Report, Ex. B, at Attachment 5 (reflecting that Plaintiffs allegedly suffered $3,004,606 in "lost profits" due to new patients allegedly lost from CMC; **$5,059,149** due to new patients allegedly lost from **Plaintiffs' own office**; and **$1,927,134** due to new patients allegedly lost from **"other"** locations); *see also* Sept. 2012 Luke Report, Ex. A, at Fig. 10 (showing that Plaintiffs allegedly lost the most new patients not at "CMC," but rather at "Office" and "Other").

[18]  *See* Sept. 2012 Luke Report, Ex. A, at ¶ 109 (referring to the actions allegedly taken by "Mr. Brown and his subordinates" as the potential cause of Plaintiffs' alleged lost new patients).

[19]  Luke Dep., Ex. I, at pp. 174-177.

testimony of a proposed "damages expert" was excluded when his report "did not link a single loss to a specific misconduct and ignored significant factors that might have excluded the torts as the reason for the losses."   In other cases, courts have found that testimony is irrelevant if "not based upon a correct assumption that such losses . . . were caused by the alleged conduct of the defendants."   *Sigur v. Emerson Process Mgmt.*, No. 05-1323-A-M2, 2007 WL 1893632, at *3 (M.D.La Apr. 25, 2007).   An expert's opinion can be relevant only "to the extent [the party offering his testimony] can present competent evidence demonstrating that the underlying causation assumption is valid and that other factors . . . were considered in determining causation."   *Id* at *5.

Luke's deposition testimony confirms that there is a complete lack of connection between the liability claims in this case and Plaintiffs' purported loss of new patients.  Asked to give the basis for his opinion that CMC and Brown caused Plaintiffs to lose new patients, Luke vaguely asserted that "the administrator" and "the board" of CMC had "pressure[d]" emergency room physicians, staff and primary care physicians, and general surgeons to not refer patients to Plaintiffs.[20] Luke then elaborated that the board had exerted this pressure by sending a letter *to Plaintiffs* in December 2009 (Luke was unable to identify a single physician besides Plaintiffs who was aware of the letter) and by "the very fact of employing

---

[20] *See* Luke Dep. at pp. 120-22.  A copy of Luke's deposition is attached hereto as **Exhibit I**.

the cardiologists."[21]  Luke stated that Brown had reduced new patient referrals to Plaintiffs by allegedly deciding that they would not be on "the electrocardiogram reading rotation" and that the CMC cardiologists would interpret "ultrasound studies," and by engaging in "a pattern of communication to the medical staff" about Plaintiffs' standing at CMC.[22]

None of the allegations identified by Luke at his deposition as supposedly having caused a reduction in new patients is actually the basis for a liability claim in this lawsuit.  Indeed, there is no claim in this case that CMC or Brown defamed or disparaged Plaintiffs to referring physicians or that they somehow pressured referral sources.  <u>This is not a defamation or tortious interference case against CMC and Brown, but that seems to be Luke's main premise in opining that CMC and Brown caused a loss in new patients.</u>  Furthermore, prior to their recent, improper efforts to amend their complaint to expand the scope of their claims against CMC and Brown, Plaintiffs did not allege that the mere hiring of cardiologists constituted an equal protection violation (instead, Plaintiffs simply complained that they allegedly did not receive genuine employment offers and were not also hired), and, while they complained about other alleged hospital practices and procedures, Plaintiffs did not plead that any practice with respect to

---

[21] *See id.* at pp. 129-32.

[22] *Id.* at pp. 133-36.

electrocardiogram readings and ultrasound interpretations somehow constitutes an adverse discriminatory action.[23]  It is too late for Plaintiffs to expand their claims now to fit their damages theories.[24]

Because Luke's and Glass's lost new patient opinions and damages calculations do not relate to the actual liability claims in this case, the Court should exclude them as irrelevant.

### 2. The Lost New Patient Opinions Is Speculative And Overlooks Other Reasons Besides Defendants' Alleged Conduct That Might Account For A Decline In New Patients.

Even if Luke's and Glass's lost new patient opinions were relevant, they should still be excluded because they are fundamentally unreliable.  Indeed, although Luke—and by extension, Glass—are eager to pin the blame for the alleged decline in new patients on Defendants' alleged wrongful acts, neither witness can, or even tries to, account for various other factors that might explain the alleged decline in new patients.  This alone renders their opinions inadmissible.

---

[23] *See* Pltf. 2d Am. Complaint, Dkt. 91, at ¶¶ 47-57; *Gaalla v. Brown*, 460 F. A'ppx at 479.

[24] *See* CMC Defendants' Motion to Strike Portions of Plaintiffs' Third Amended Complaint at 8, 17-19 (Dkt. 353).  Moreover, any suggestion that CMC's mere hiring of cardiologists who will compete with Plaintiffs for new patients is somehow a violation of their equal protection rights is simply wrong.  CMC's expansion of its cardiology staff does not subject Plaintiffs to differential treatment in violation of the Equal Protection Clause.  Indeed, *all doctors* in Victoria are subject to the *same competition* at any given time.  By seeking to cast CMC in damages for hiring cardiologists, Plaintiffs are simply trying to control the market and restrain competition for the benefit of their bottom line.  The Equal Protection Clause does not immunize Plaintiffs from competition, and Plaintiffs simply do not have a valid equal protection claim premised on CMC's decision to employ cardiologists.

*See Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (affirming district court's exclusion of expert testimony in an employment discrimination case, and explaining that the expert evidence was problematic in part because the expert failed to consider "other variables" besides discrimination—such as education and experience—that might explain any observed statistical discrepancy in promotion rates between persons of different races); *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1085 (D. Kan. 2000) (improper attribution of all losses to defendants' illegal acts, despite presence of other factors, infects basic methodology).

There are a myriad of other factors besides any alleged wrongful conduct by Defendants that could explain a reduction in Plaintiffs' new patient loads.  For instance, referring physicians—a major source of new patients—may for their own reasons have decided to refer fewer patients to Plaintiffs.  These reasons do not necessarily have to relate to anything Defendants did; indeed, the reasons could be a difference of opinion with Plaintiffs, an interpersonal conflict, independent medical judgment, a simple change in preference, new relationships with other cardiologists, or any of a number of other conceivable reasons.  Plaintiffs may also have simply failed to cultivate new relationships to replace referring physicians who have moved on or retired.  Defendants' expert, Don Barbo, investigated the reasons why the primary care physicians with the largest decline in patient referrals

to Plaintiffs had reduced their referrals to Plaintiffs.[25]  He found that they did so for reasons that had absolutely nothing to do with the alleged actions of Defendants.[26] Barbo learned that Plaintiffs stopped accepting referrals from some physicians; that other referring physicians had had a bad experience with Plaintiffs; and that still others had left town or did not even have privileges at CMC (and thus were not even arguably under the control or influence of CMC).[27]  Barbo also learned that some of the referring physicians with the largest declines in referrals to Plaintiffs still made *all* of their referrals to Plaintiffs, suggesting that the reason for the decline had nothing to do with any "pressure" by CMC or Brown to not refer patients to them.[28]  Unlike Barbo, neither Luke nor Glass made any investigation into the actual reasons why referring physicians have referred fewer new patients to Plaintiffs—they just assumed it was due to Defendants' alleged conduct.[29]

Another factor that could explain a reduction in Plaintiffs' new patient loads is Plaintiffs' voluntary decision to resign from on-call service at CMC in 2007.  As Barbo explains, taking emergency room call is a potential source of new patients

---

[25] Barbo Report, Ex. G, at pp. 39-42.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *See* Luke Dep., Ex. I, at pp. 121-22, 172.

for a physician.[30]  Plaintiffs removed themselves from the call roster at CMC in November 2007, after CMC ceased paying physicians extra to take call.[31]  In so doing, Plaintiffs unnecessarily cut themselves off from a potential stream of new patients.

The foregoing are only examples.  There are many other factors besides alleged wrongful conduct by Defendants that plausibly could have caused a decline in new patients.  There is, for instance, the simple fact that there are now two more cardiologists in Victoria (Drs. Junor and Tillman) competing for new patients than there were in 2006.[32]  There is also the possibility that acquiring new patients at the rate Plaintiffs allegedly acquired them in 2006 was simply not sustainable for them over the long haul.[33]

In the end, Luke's opinion—which forms the basis for Glass's damages calculation—that Defendants' alleged conduct caused the alleged decline in Plaintiffs' new patient loads is extraordinarily speculative and unsupported by any evidence or independent investigation, and, therefore, it is simply not the product

---

[30] Barbo Report, Ex. G, at p. 37-39.

[31] *See* letter dated Oct. 31, 2007, from Plaintiffs to CMC, Dkt. 131-15; Brown Aff., Dkt. 131-10. *See also* Defendant David P. Brown's Brief Pursuant to Fifth Circuit Remand Order in Support of Motion for Summary Judgment at 10 (Dkt. 267); Defendant David P. Brown's Reply to Plaintiffs' Response to Defendants' Brief on *McDonnell Douglas* Analysis at 20-21 (Dkt. 321).

[32] Barbo Report, Ex. G, at pp. 36-37.

[33] *See id.* at p. 42-43.

of a reliable methodology.  Like Plaintiffs themselves, Luke simply assumes that Defendants are responsible for the alleged decline in new patients, even though there is really no proof, and instead plenty of reason to believe that other factors are at work.  As a consequence, the Court should exclude Luke's and Glass's opinions and damages calculations regarding alleged lost new patients.  *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59-60 (2d Cir. 2002) (affirming the district court's exclusion of expert testimony regarding damages for loss of a business where expert assumed the loss of the business was caused by disparaging statements made by the defendants, but where there was no evidence that the statements actually were the cause).

### B.    Luke's And Glass's Opinions Regarding Alleged "Steered" Patients Are Irrelevant And Unreliable.

Luke and Glass also opine that Plaintiffs have suffered or will suffer nearly $400,000 in damages due to the loss of alleged existing patients, whom Plaintiffs contend were "steered" by CMC to the care of its own cardiologists.  As the basis for this opinion, Luke examined billing records of both Plaintiffs and CMC in an attempt to identify the patients who supposedly belonged to Plaintiffs but were allegedly "steered" by CMC.  Luke originally took the approach that any patient who his data showed had once been seen by Plaintiffs but later seen by a CMC

cardiologist after 2006 had been improperly "steered."[34]  Luke later changed his analysis to exclude patients who had first seen CMC's cardiologists without a prior visit to CMC,[35] and, in his most recent report, Luke changed his analysis again to exclude patients whom even Plaintiffs now concede had not been "steered."[36] Luke's constantly changing methodology has caused his total of allegedly "steered" patients to decline from 1,100 (November 2010) to 736 (December 2010) to 451-516 (September 2012).[37]

As the constant shifts in methodology might suggest, Luke's opinion purporting to identify patients allegedly "steered" by CMC—which forms the basis for Glass's calculation of alleged "lost profits" attributable to the alleged loss of these patients[38]—is fundamentally unreliable.  The truth is, Luke has done no work to determine whether the 451 or 516 patients on his "steered" patient list were, in fact, "steered" away from Plaintiffs due to some unlawful conduct by Defendants. Plaintiffs allege, and Luke asserts, that CMC supposedly "steered" these patients by refusing to call Plaintiffs when the patients presented at the CMC emergency

---

[34] *See* Nov. 2010 Luke Report, Ex. C, at ¶ 16.

[35] Luke Dep., Ex. I, at pp. 143-44; *compare* Nov. 2010 Luke Report, Ex. C, at ¶ 16 *with* Dec. 2010 Luke Report, Ex. E, at ¶ 16.

[36] *See* Sept. 2012 Luke Report, Ex. A, at ¶ 60.

[37] Nov. 2010 Luke Report, Ex. C, at ¶ 16; Dec. 2010 Luke Report, Ex. E, at ¶ 16; Sept. 2012 Luke Report, Ex. A, at ¶ 61.

[38] Sept. 2012 Glass Report, Ex. B, at pp. 6-8.

room.[39]  But Luke admits that he conducted no actual investigation to determine whether the patients on his list considered one of the Plaintiffs to be their doctor, disclosed that information to CMC, and requested that Plaintiffs be called, only to be refused.[40]  Luke conceded that he did not interview any patients, and he could not testify as to what may have occurred during any visit a patient made to CMC.[41]  Furthermore, there is simply no evidence that the patients on Luke's list were "steered" to CMC's cardiologists based on a refusal by CMC personnel to call Plaintiffs.

Luke's opinion regarding "steered" patients is purely speculative.  Having done no actual investigation, Luke cannot rule out the possibility that other factors—rather than an act of "steerage"—accounted for any actual switch by a

---

[39] Sept. 2012 Luke Report, Ex. A, at ¶ 57.  Given that this alleged conduct *by CMC* is the only alleged "mechanism" of "steerage," the entire "steerage" issue is totally irrelevant to Dr. Campbell, and Luke and Glass should not under any circumstance be permitted to testify regarding alleged "steerage" damages attributable to Dr. Campbell.

[40] *See* Luke Dep., Ex. I, at pp. 122-23, 124-25, 150-56.  Although Luke claims that he reviewed 16 written statements by patients who had supposedly asserted that CMC would not call Plaintiffs when they presented at the emergency room, Luke admitted that these cherry-picked statements are not a random sample and cannot be used to extrapolate conclusions about the population of hundreds of allegedly "steered" patients that he has purported to identify.  *See id.* at 122-23, 156-57.  In any event, CMC investigated the circumstances surrounding these 16 patients' visits to CMC, and Plaintiffs' suggestion that they are evidence of improper "steerage" is disputed.  Citizens Medical Center's Response to Plaintiffs' Motion to Hold Citizens Medical Center in Contempt at 14-16 (Dkt. 136).

[41] *See* Luke Dep., Ex. I, at pp. 122-23, 124-25, 150-56.  Luke's lack of investigation is particularly problematic given that he conceded there would be no "steerage" if CMC did not even know about a patient's prior relationship with Plaintiffs.  *See id.* at p. 245.

patient from Plaintiffs to a CMC cardiologist.  For example, the patients on Luke's list might well have:

- made a free choice to see a new doctor;

- had a bad experience with Plaintiffs or a poor opinion of Plaintiffs that made them unwilling to return to Plaintiffs or to call Plaintiffs themselves;

- failed to remember or disclose a prior relationship with Plaintiffs; or

- had an emergency that, in the medical judgment of the emergency room physician at CMC, necessitated calling the designated on-call cardiologist at CMC rather than spending time trying to locate Plaintiffs, who might not be available.

There are other possibilities as well.  Despite all of them, Luke and Glass simply assume that the patients Luke has identified were improperly "steered" and give rise to a damages model.  Under these circumstances, and based on the authorities cited above, the Court should exclude Luke's and Glass's opinions and damages calculations regarding alleged "steered" patients.

## C. Glass's Opinions Regarding On-Call Payments Are Irrelevant And Unreliable.

At Plaintiffs' request, Glass also computed "lost revenue" from "on-call payments" at CMC at the rate of $5,000 per doctor per month for the period August 2007 through 2022.[42]  The total "lost revenue" calculated by Glass is approximately $2.23 million.

---

[42] Sept. 2012 Glass Report, Ex. B, at p. 11.

Glass's opinion with respect to "lost" on-call payments is irrelevant and inadmissible. Plaintiffs have absolutely no claim in this case that would allow them to recover payments for on-call services. Indeed, in their second amended complaint, Plaintiffs made no allegation of a wrongful denial of on-call payments as a basis for their equal protection claim.[43] And even if they had, a claim based on such an allegation would clearly have failed.[44]

Separately, Glass's aggregation of "lost revenue" from on-call payments is not a proper damages model. Glass admitted at his deposition that he made this damages calculation solely at the request of counsel and had no opinion "that the amounts you calculate here for lost on-call payments was caused by any wrongful

---

[43] *See* Pltf. 2d Am. Complaint, Dkt. 91, at ¶¶ 47-57. Plaintiffs have attempted in their Third and Fourth Amended Complaints to concoct such a claim, but that is the subject of CMC Defendants' Motion to Strike Portions of Plaintiffs' Third Amended Complaint at 8 (D.E. 353). Plaintiffs, of course, also made no mention of the issue in their claims against Dr. Campbell, who has nothing to do with whether CMC pays physicians to take call. *See id.* at ¶¶ 58-71.

[44] As discussed above, Plaintiffs voluntarily removed themselves from the on-call service at CMC in October 2007, after CMC decided to no longer pay cardiologists to take call (an eminently reasonable decision, given that CMC had just hired cardiologists who could perform the service as part of their employment duties). *See* letter dated Oct. 31, 2007, from Plaintiffs to CMC, Dkt. 131-15; Brown Aff., Dkt. 131-10; Defendant David P. Brown's Brief Pursuant to Fifth Circuit Remand Order in Support of Motion for Summary Judgment at 10 (Dkt. 267); Defendant David P. Brown's Reply to Plaintiffs' Response to Defendants' Brief on *McDonnell Douglas* Analysis at 20-21 (Dkt. 321). Any complaint about the lack of payment or their resignation from the on-call service would have been barred by limitations by the time Plaintiffs filed suit in February 2010. *See Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (statute of limitations for § 1983 actions is two years). But even if not barred, any such complaint would not have stated a valid claim. Plaintiffs had no contractual right or other entitlement to receive payments for performing on-call services, and CMC was certainly free to cease paying physicians to take call.

conduct of the defendants."[45]  It is undisputed that Plaintiffs had no contract for on-call services, and have not performed on-call services at CMC since they resigned from doing so in October 2007.[46]   Plaintiffs could not possibly be entitled to recover payment for services they have not performed.

### D.    Luke's And Glass's Opinions Regarding Research Studies Are Irrelevant And Unreliable.

Luke and Glass also opine that Plaintiffs have suffered or will suffer $2.23 million in damages due to an alleged loss of medical research revenue attributable to a supposed decline in the number of CMC patients enrolled in studies conducted by Plaintiffs.[47]   As the basis for this opinion, Luke asserts that during the period 2004-06, Plaintiffs conducted a dozen research studies at CMC, with the number of patient enrollees in those studies constituting some 38% of the total enrollees in all hospital-based studies conducted by Plaintiffs (Plaintiffs also conducted research studies at DeTar Hospital).[48]   After 2007, according to Luke, "[t]here were no new research contracts with CMC," and, beginning in 2007, the percentage of CMC patient enrollees in Plaintiffs' hospital-based studies declined below 38%.[49]

---

[45] Glass Dep., Ex. I, at 147-49.

[46] Barbo Report, Ex. G, at pp. 50-51.

[47] Sept. 2012 Luke Report, Ex. A, at ¶¶ 65-73; Sept. 2012 Glass Report, Ex. B, at pp. 13-14.

[48] Sept. 2012 Luke Report, Ex. A, at ¶¶ 69-70.

[49] Id. at ¶¶ 69-70.

Adopting the explicit assumption that "on average, CMC hospital based studies would have continued to provide 38% of total enrollees," Luke and Glass then calculate the alleged "lost profits" they attribute to the decline in patients below the 38% level after 2006.[50]   They also project future alleged losses based on a continued alleged decline of CMC patient enrollees through 2022.[51]

Like their other opinions, Luke's and Glass's opinions regarding research studies are irrelevant and unreliable.  Again, there is simply no connection between the pleaded liability claims in this case and Luke's and Glass's damages model premised on an alleged "significant difficulty recruiting and enrolling new CMC patients into research studies" beginning in 2007.[52]   Plaintiffs' second amended complaint made no mention of any interference by Defendants with Plaintiffs' ability to enroll CMC patients in studies, and the Fifth Circuit did not list anything having to do with research studies as one of the several alleged actions that formed the basis of Plaintiffs' equal protection claim.[53]   Plaintiffs have recently tried to expand their equal protection claim in their third and fourth amended complaints to include allegations that "CMC and Brown also discriminated against the Plaintiffs

---

[50] *Id.* at ¶¶ 70-73; Sept. 2012 Glass Report, Ex. B, at pp. 13-14.

[51] *See* Sept. 2012 Glass Report, Ex. B, at pp. 13-14.

[52] Sept. 2012 Luke Report, Ex. A, at ¶ 69.

[53] *See* Pltf. 2d Am. Complaint, Dkt. 91, at ¶¶ 47-57; *Gaalla v. Brown*, 460 F. A'ppx at 479.

related to their ability to conduct medical research studies at the hospital" by creating an "intolerable environment" and refusing to approve studies.[54]  These allegations are not only absolutely false, but they are also made far too belatedly, and should be stricken.[55]  Plaintiffs should not now be allowed to expand their claims to support irrelevant damages models.

In addition, Luke's and Glass's opinions and calculations regarding research studies are unreliable.   Indeed, there is no evidence to support their core assumption that CMC patients should always remain 38% of the total enrollees in their hospital-based studies just because that is supposedly what they comprised for a three-year period last decade.   As Luke recognizes, separate contracts govern studies to be conducted at DeTar versus studies to be conducted at CMC.[56]  There is no set relationship between the studies at DeTar and the studies at CMC that would dictate that, in perpetuity (or at least until 2023), every time Plaintiffs enroll 62 patients in studies at DeTar, they should necessarily enroll 38 patients in studies at CMC.  But that is the premise on which Luke and Glass calculate the alleged damages relating to research studies.

---

[54] Pltf. 4th Am. Complaint, Dkt. 362, at ¶¶ 10, 36.

[55] *See* CMC Defendants' Motion to Strike Portions of Plaintiffs' Third Amended Complaint at 9-10, 17-19 (Dkt. 353).

[56] *See* Sept. 2012 Luke Report, Ex. A, at ¶ 69.

Furthermore, Luke's opinion that Defendants' alleged conduct caused Plaintiffs to suffer damages related to research studies is illogical. If, hypothetically, CMC had outright *banned* Plaintiffs from conducting studies at CMC, Plaintiffs could have fully mitigated any losses simply by enrolling more patients at DeTar or conducting additional research studies there. In any event, there is no evidence that CMC precluded Plaintiffs from conducting research studies at CMC or that Plaintiffs could have obtained contracts to conduct studies at CMC but for some conduct of Defendants. To the contrary, it is indisputable that CMC has approved every study proposed by Plaintiffs and that Plaintiffs never applied for any contracts at CMC after March 2007.[57] Thus, Luke's causation opinion is, again, nothing more than unsupported *ipse dixit* assertion.

For the foregoing reasons, Luke's and Glass's opinions and calculations relating to research studies are inadmissible and should be excluded by the Court.

## II. Independent Of The Foregoing, Luke's And Glass's Opinions Regarding Future Damages Are Inadmissible And Should Be Excluded.

Although the foregoing demonstrates that the Court should exclude Luke's and Glass's opinions in their entirety, there are separate, additional grounds for excluding the portions of their opinions that relate to alleged future damages. As indicated above, Luke and Glass do not merely opine as to the damages they contend Plaintiffs have suffered through the present date, but they also project

---

[57] Barbo report, Ex. G, at pp. 52-53.

future losses that they predict Plaintiffs will incur based on their further prediction

that the alleged wrongful conduct of Defendants will continue to recur until 2023.

The following is a summary of the portions of Luke's and Glass's damages claims

that relate to predicted future damages based on predicted future alleged wrongful

conduct:

- Approximately $7.5 million of the total $10.35 million lost new patients damages calculation constitutes alleged future damages that Luke and Glass predict Plaintiffs will incur from 2013 through 2023; almost all of this $7.5 million alleged future damages figure relates to the 1,375 new patients that Luke predicts Plaintiffs will lose each year beginning in 2013.[58]

- Approximately $169,000-$172,000 of the $385,000-$392,000 total "steered" patients damages calculation constitutes alleged future damages that Luke and Glass predict Plaintiffs will incur from 2013 through 2022; most of these alleged future damages relates to patients that Luke predicts will be "steered" in 2013 and beyond.[59]

- Approximately $1.26 million of Glass's calculation of $2.23 in alleged lost "on-call payments" relates to predicted future loss of hypothetical payments that would relate to call service in 2013 through 2022.[60]

- Approximately $1.8 million of the total $3.26 million research studies damages calculation constitutes alleged future damages that Luke and Glass predict Plaintiffs will incur from 2013 through 2022 based on the prediction that Defendants' future conduct will allegedly preclude

[58] See Sept. 2012 Glass Report, Ex. B, at Attachment 5; see also Luke Dep., Ex. I, at pp. 141, 204.

[59] See Sept. 2012 Glass Report, Ex. B, at pp. 7-8 and Attachment 6; Luke Dep., Ex. I, at p. 204; Glass Dep. at pp. 109-11. A copy of Glass's deposition is attached hereto as **Exhibit J**.

[60] See Sept. 2012 Glass Report, Ex. B, at pp. 11-12.

> Plaintiffs from enrolling the number of patients in studies at CMC that Luke predicts Plaintiffs should be able to enroll.[61]

In total, approximately $10.7 million, or two-thirds, of Luke's and Glass's $16.2 million damages calculation relates to the above-described future damages.

The Court should exclude Luke's and Glass's opinions regarding future damages because they are purely speculative.  There is no basis for assuming, as Luke and Glass do, that if Plaintiffs somehow prevail on their claims, and obtain the injunctive relief they seek, future circumstances and conduct will precisely mirror the past.  There is no basis for assuming that if Defendants are somehow found to have wronged Plaintiffs, they will continue to do so for the next decade.

Luke's and Glass's own testimony sets in stark relief the baseless nature of their speculative future damages predictions.  Both witnesses, whom Plaintiffs tout as very experienced and respected, testified at their deposition that they had *never before* calculated future damages predicated on assumptions of future wrongful conduct, as they do in this case.  Luke testified as follows:

> Q.    As far as the conduct of the defendant, have you ever calculated damages in the future for conduct … that the defendant has not yet committed in the future?
>
> A.    Not with regard to the defendant, no.
>
> Q.    All right.  Well, in this case you have calculated projections of lost revenues and – and Dr. Glass damages for conduct of these

---

[61] *See* Sept. 2012 Glass Report, Ex. B, at pp. 13-14 and Attachment 7.

defendants that has – that will occur in the future with regard to interference, as you've called it, correct?

A.    Uh-huh.  A continuing pattern of current behavior, yes.[62]

Glass testified in similar fashion:

Q.    Okay.  You don't – you're relying on [Luke's] opinion as to whether there will be future conduct that will cause the loss of future patients; is that right?

A.    Yes.

Q.    And similarly, whether there will be future steerage of patients that will result in lost steered patients in the future, you're relying on his opinion there?

A.    Yes, sir.

Q.    You don't have – and did not form an independent opinion about that – whether … any future conduct will occur that will cause future losses; is that true?

A.    That's true.

Q.    All right.  Have you ever done that before in any case any time anywhere in any context where you assumed that there was going to be conduct that occurred in the future that has not yet occurred that would cause losses in the future?

A.    No, I – I – I don't think so.  But I'm – I certainly have computed future lost profits for companies based upon the fact that the damages done was – was permanent to the –

Q.    Yes.

A.    – to the company.

Q.    In those cases the – the conduct had already occurred in the past?

---

[62] Luke Dep., Ex. I, at p. 210.  *See also id.* at 140-142.

A.   (Moving head up and down)

Q.   And it just continued into the future?

A.   Yes.

Q.   Like a business that – that was destroyed last year will – you projected that in – it would have – it would have had future revenues and profits in the future had it not been destroyed –

A.   Right.

Q.   last year?  But you've not done anything where you said, "I pre – predict that there's going to be some – a destruction of business three years from now that will cause damages three years from now."   That's not something you have typically done, correct?

A.   No.[63]

The Court should reject Plaintiffs' attempt to reap a windfall consisting of hypothetical damages flowing from hypothetical future conduct.   As Luke admitted, "none of us know what's going to happen tomorrow."[64]   Under no circumstance should Luke or Glass be permitted to testify regarding their speculative future damages models.

## CONCLUSION

For the reasons stated above, this Court should exclude the testimony and opinions of Plaintiffs' proposed damages experts, Ronald T. Luke and Thomas W. Glass.  Defendants also request all other relief to which they may be justly entitled.

---

[63] Glass Dep., Ex. J, at pp. 111-13.

[64] Luke Dep., Ex. I, at p. 142.

Respectfully submitted,

_/s/ Daniel M. McClure_

Daniel M. McClure
State Bar No. 13427400
Federal I.D. No. 1726
_Attorney-in-Charge_
Lance R. Bremer
State Bar No. 24006892
Federal I.D. No. 23221
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
Facsimile:   (713) 651-5246

Kevin D. Cullen
State Bar No. 0508625
Federal I.D. No. 957
CULLEN, CARSNER, SEERDEN & CULLEN,
L.L.P.
119 South Main Street
P.O. Box 2938
Victoria, Texas 77902
Telephone:  (361) 573-6318
Facsimile:  (361) 573-2603

Darrell L. Barger
State Bar No. 01733800
Federal I.D. No. 646
HARTLINE DACUS BARGER DREYER LLP
800 North Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
Telephone:  (361) 866-8000
Facsimile:  (361) 866-8039

**_Counsel for Defendants Citizens
Medical Center and David P. Brown_**

Respectfully submitted,

*/s/ Rex Easley, Jr.*

Rex Easley, Jr.
State Bar No. 06358425
Federal I.D. No. 5886
*Attorney-in-Charge*
COLE, COLE & EASLEY P.C.
302 W. Forrest St.
Victoria, Texas 77901
Telephone:  (361) 575-0551
Facsimile:   (361) 575-0986

**Counsel for Defendant William Todd
Campbell, Jr., M.D.**

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 19th day of October, 2012, a true and correct copy of the above and foregoing document was served via ECF electronic notice upon counsel of record herein.


_____
*/s/ Daniel M. McClure*
Daniel M. McClure