UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| AJAY GAALLA, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 6-10-14 |
| | § | |
| CITIZENS MEDICAL CENTER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

After numerous district court rulings and two interlocutory appeals, the remaining dispositive motion in this longstanding case is Defendant David P. Brown's summary judgment motion that the Fifth Circuit remanded for reconsideration under a different evidentiary framework. *See Gaalla v. Brown*, 460 F. App'x 469, 481–82 (5th Cir. 2012). Those remanded claims are the ones that cardiologist Plaintiffs, Drs. Ajay Gaalla, Harish Chandna, and Dakeshesh "Kumar" Parikh, assert against Brown, the chief administrator of codefendant Citizens Medical Center ("CMC"), alleging that eight actions he took from 2007 through 2009 violated the Equal Protection Clause.

The Fifth Circuit disagreed with Plaintiffs that there is direct evidence of discrimination and remanded for evaluation of the claims under the "*McDonnell Douglas* burden-shifting framework" to determine whether there is sufficient circumstantial evidence of discrimination to get the case to a jury. *Gaalla*, 460 F.

App'x at 481–82.  The Fifth Circuit also emphasized that this Court should "connect the evidence" to each of the eight challenged actions.  *Id*. at 480.  With this guidance in mind, the Court has reviewed the motion, briefing, arguments of counsel, and applicable law to separately evaluate the circumstantial evidence for each challenged action and determines that Brown's Motion for Summary Judgment should be **GRANTED IN PART** and **DENIED IN PART**.

## I.   PROCEDURAL HISTORY

Other opinions summarize the history of this case, *see, e.g.*, *Gaalla*, 460 F. App'x  at 472–74, so this one will just trace the path of Brown's summary judgment motion as it relates to claims that remain against him.[1]  In November 2010, Brown filed his motion arguing that qualified immunity entitled him to dismissal of Plaintiffs' claims.  Regarding the equal protection claims, the district court (Jack, J.) found that Plaintiffs had presented direct evidence suggesting that racial animus motivated Brown's actions.

Brown, together with other defendants, appealed various aspects of the summary judgment ruling, including the holding that Plaintiffs had produced sufficient direct evidence to raise a fact issue on the discrimination claims.  The Fifth Circuit disagreed that direct evidence of discrimination existed, explaining

---

[1] The primary impetus for this lawsuit was a Resolution that CMC's Board passed on February 17, 2010, which restricts hospital privileges to cardiologists who had contracts with CMC, and thus precludes Plaintiffs from practicing at CMC.  That claim remains against CMC.  State law claims also remain against codefendant Dr. William Campbell.

that general evidence of discriminatory animus does not automatically establish that such animus motivated a particular challenged employment action. *See id.* at 479–80. As an example, although the Court of Appeals described a memo Brown wrote as an "obvious instance of discriminatory attitude," *id.* at 473, it nonetheless concluded that the memo did not "show[] on its face that an improper criterion served as a basis . . . for the adverse employment action. *Id.* at 479 (quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003)). Given its determination that direct evidence of discrimination did not exist, the Fifth Circuit remanded for this Court to analyze in the first instance whether Plaintiffs had produced sufficient circumstantial evidence to get to a jury on each of the challenged actions.

## II.   APPLICABLE LEGAL STANDARDS

### A.   The Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue on any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* The movant has the burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v.*

*Catrett*, 877 U.S. 317, 331 (1986).  All reasonable doubts on questions of fact must be resolved in the nonmovant's favor.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

### B.    The *McDonnell Douglas* Framework

"Because direct evidence is rare" in employment discrimination cases, the *McDonnell Douglas* burden-shifting framework that the Court of Appeals directed this Court to apply is the one typically applied at the summary judgment stage.[2] *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994).  Under *McDonnell Douglas*, the plaintiff first has the burden to establish a prima facie case of discrimination.  *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory action.  *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If a defendant advances such a justification, then the burden shifts back to the plaintiff to demonstrate that the proffered reason is not the true reason for the action, but rather is a pretext for discrimination.  *Reeves*, 530 U.S. at 143 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

---

[2] Although Plaintiffs allege equal protection violations under section 1983, in employment discrimination cases, "'Section 1983 and [T]itle VII are parallel causes of action.'"  *Gaalla*, 460 F. App'x at 480 n.7 (quoting *Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 166 (5th Cir. 2007)).  This opinion therefore relies on many Title VII cases.

To establish a prima facie case of discrimination, Plaintiffs must show that they (1) are members of a protected class; (2) were qualified for the positions; (3) were subject to an adverse employment action; and (4) that other similarly situated employees were treated more favorably. *Bryan*, 375 F.3d at 360 (citing *Okoye v. Univ. of Tex. Hous. Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001)). The parties do not dispute that Plaintiffs, who are licensed cardiologists of Indian origin, satisfy the first two elements of this test.

Brown argues on remand that some of the eight challenged actions are not actionable adverse employment actions. *See, e.g.*, Docket Entry No. 267 at 17–19. But the Court finds that Brown forfeited this argument by not raising it in his initial summary judgment motion. As the Fifth Circuit found in concluding that it could not consider the adverse action argument on appeal, "Brown did not argue at the summary judgment stage that any of his alleged acts were not adverse employment actions." *Gaalla*, 460 F. App'x at 479 n.6. The remand does not give Brown another bite at the apple. The Court of Appeals remanded with specific instructions for this Court to evaluate the equal protection claims under a lens of circumstantial rather than direct evidence; nothing in the opinion opens the door to another round of summary judgment motions with new arguments.

Brown seems to believe that he should be allowed to challenge whether the conduct at issue constitutes adverse employment actions for the first time on

remand because the prima facie *McDonnell Douglas* test includes adverse employment actions as an element. *See* Docket Entry No. 267 at 3–4. But the adverse action requirement is an element of any discrimination claim, whether the evidence used to prove that claim is direct or circumstantial. *See, e.g.*, *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) ("If an employee presents credible *direct evidence* that a discriminatory animus at least in part motivated, or was a substantial factor in the *adverse employment action*, then it becomes the employer's burden to prove . . . that the same decision would have been made regardless of the discriminatory animus." (citations omitted and emphasis added)). The Fifth Circuit recognized as much in this case when it explained that direct evidence must show "on its face that an improper criterion serves as a basis—not necessarily the sole basis, but a basis—for the *adverse employment action*." *Gaalla*, 460 F. App'x at 479 (emphasis added) (quoting *Fabela*, 329 F.3d at 415). Brown therefore had every reason to timely raise the defense in his initial summary judgment motion and the Court will not consider the argument at this late stage.[3] *See Lopez v. River Oaks Imaging & Diagnostic Grp.*,

---

[3] The Court's view that the remand was limited to evaluating the claims against Brown under a circumstantial evidence standard and did not set a new deadline for summary judgment motions also prevents it from considering other new arguments each side makes. The Court will not consider the three new actions Plaintiffs have alleged in their response to Brown's supplemental briefing on remand. *See* Docket Entry No. 281 at 33–37. These actions were not identified by the Fifth Circuit as actions to be considered under the *McDonnell Douglas* framework on remand. *See Gaalla*, 460 F. App'x at 479.

*Inc.*, 542 F. Supp. 2d 653, 658 n.9 (S.D. Tex. 2008) ("The Fifth Circuit consistently holds that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal.  By analogy, failure to brief an argument in the district court waives that argument in that court." (citations omitted)).

### C.  The "Similarly Situated" Requirement

Because Brown does not challenge the first two elements of the prima facie case and forfeited challenging the third, the only element of the prima facie case to consider is whether other similarly situated employees were treated more favorably.[4]  With respect to the "similarly situated" requirement, the Fifth Circuit has explained that "an employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'"  *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).  "Nearly identical," however, should not be interpreted as synonymous with

---

The Court also will not consider Brown's assertion that two of the actions the Fifth Circuit identified are barred by the statute of limitations.  *See* Docket Entry No. 321 at 19 n.8, 24 n.11.  Brown's original motion for summary judgment incorporated CMC's motion for summary judgment.  Docket Entry No. 135 at 6–7.  CMC's motion argued this statute of limitations defense.  Docket Entry No. 133 at 8–9.  In ruling on these motions, the Court rejected this defense on the ground that Defendants had failed to meet their burden of establishing when the causes of action accrued.  Docket Entry No. 177 at 9–11.  Brown did not appeal the limitations issue to the Fifth Circuit, so the Court will not consider it on remand.

[4] Due to the importance of this remaining prima facie element to the summary judgment ruling, the Court ordered the parties to provide supplemental briefing in the form of a separate chart for each of the eight claims in which Plaintiffs had to identify their alleged similarly situated comparators.  *See* Docket Entry Nos. 384, 388, 395.

"identical."  *Id.*  "[A] requirement of complete or total identity rather than near identity would be essentially insurmountable . . . ."  *Id.*

A number of factors are examined when determining whether a proposed comparator's actions occurred under nearly identical circumstances:

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.  And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions.

*Id.* (internal quotation marks and citations omitted).  "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated."  *Id.* (emphasis in original) (quoting *Wallace v. Methodist Hosp. Sys., Inc.*, 271 F.3d 212, 221 (5th Cir. 2001)).

In determining the potential class of comparators from which Plaintiffs may be able to identify similarly situated individuals under the *Lee* criteria, the Court will take into account that Plaintiffs work in a specialized field of medicine in a city of fewer than 100,000 residents.  Viewing potential comparators so narrowly as to include only other cardiologists employed at CMC would not provide the same scope of comparison available to a mechanic employed with a large aerospace and aircraft manufacturer, *see McDonnell Douglas*, 411 U.S. at 794, or

to an engineer employed with an interstate railroad, *see Lee*, 574 F.3d at 255–56. For that reason, as discussed below, in considering the "same job and responsibilities" aspect of the similarly situated inquiry, *id.* at 260, the Court will consider in appropriate circumstances whether other specialized doctors subject to the same supervisor and hospital policies were treated more favorably. *Cf. Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338–40 (5th Cir. 2005) (discussing plaintiffs' argument that the "similarly situated" requirement should not apply when a company does not have several similarly situated employees, and citing case law to support to that argument, but concluding that plaintiffs failed to timely raise the argument (citing *Nieto v. L&H Packing Co.*, 108 F.3d 621, 623 n.5 (5th Cir. 1997)).

### D.    Qualified Immunity

One final legal issue bears mentioning before the evidentiary support for the specific claims is assessed.   Brown sought summary judgment on qualified immunity grounds, which is what entitled him to an interlocutory appeal. *Gaalla*, 460 F. App'x at 475.   A qualified immunity defense involves two issues: "(1) whether the defendant's conduct violated a constitutional right, and (2) whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation." *Id.* (citation and internal quotation marks omitted). *Gaalla* noted that a defendant is generally unable to establish the second

element in defending a discrimination claim because "it is without question clearly established that the Cardiologists have a right to be free from racial discrimination." *Id.* at 478–79 ("'[G]enerally, where the evidence is sufficient to support a claim of intentional gender or race discrimination, any immunity defense will be foreclosed.'" (quoting *Piatt v. City of Austin*, 378 F. App'x 466, 469 (5th Cir. 2010))). The remand to address Brown's actions thus only contemplates this Court considering the first qualified immunity element—whether Brown's conduct amounts to an equal protection violation—using the *McDonnell Douglas* standard. Brown's postremand supplemental briefing reflects the same understanding as it fails to even mention the second element of the immunity defense. *See* Docket Entry No. 267. The Court will thus follow the Fifth Circuit's instructions and assess only whether Plaintiffs have evidence sufficient to establish their equal protection claim.

## III.  ANALYSIS

As explained above, the *McDonnell Douglas* analysis in this case boils down to three issues: (1) whether Plaintiffs can establish a prima facie case by showing that they were treated less favorably than similarly situated employees; (2) if so, whether Brown has articulated nondiscriminatory reason for his actions; and (3) if Brown advances such a reason, whether Plaintiffs have shown that Brown's

purported justification is pretextual.  The Court will analyze these narrowed issues for each of the following actions the Fifth Circuit listed:

(1)     Brown denied privileges, including ICD privileges, to Plaintiffs.

(2)     Plaintiffs' ability to receive calls when a patient presented to the emergency room was restricted.

(3)     Brown entered into contracts with a non-Indian cardiology group.

(4)     Brown removed Plaintiffs from the Chest Pain Center Committee.

(5)     Brown amended the protocols for the Chest Pain Center to exclude Plaintiffs.

(6)     Brown initiated investigations of Plaintiffs when they lodged patient care complaints.

(7)     Dr. Chandna was removed from the Peer Review Committee.

(8)     Brown allowed Dr. Yahagi to refuse to provide Plaintiffs with surgical standby for a month.

*Gaalla*, 460 F. App'x at 479.  The Court begins with those claims that it concludes survive summary judgment, and then addresses those that do not.

A.    **Claims that Survive Summary Judgment**

Claim #2:   *Plaintiffs' ability to receive calls when a patient presented to the emergency room was restricted.*

Claim #5:   *Brown amended the protocols for the Chest Pain Center to exclude Plaintiffs.*

Plaintiffs have raised two claims that are sufficiently similar to be analyzed together: (1) that Brown restricted their ability to receive calls when their patients visited CMC's emergency room, and (2) that Brown amended the protocols of the Chest Pain Center, the section of the hospital designated for treating emergency chest pain, so that Plaintiffs were not called when their patients in the Center required the emergency care of a cardiologist.  Brown argues that Plaintiffs were not called in these situations because they removed themselves from the on-call list, the list of doctors available to be called in emergency situations.[5]  In the December 2009 email chain changing the Chest Pain Center protocols from "Page Cardiologist" to "Page Interventional Cardiologists On Call," Brown comments that he had spoken to the cardiologists under contract with CMC ("the CMC Cardiologists") "about a prompt response to patients formerly seen by [Plaintiffs]."[6]  Docket Entry No. 153-60.  Plaintiffs present evidence that the on-

---

[5] Plaintiffs admit they removed themselves from the on-call list in 2007, explaining that they did so because the CMC Cardiologists were compensated for being on-call under the terms of their contracts with CMC, while Plaintiffs were not.  *See* Docket Entry No. 281-71 ¶ 16.

[6] The email chain refers to "pcg," which stands for Drs. Parikh, Chandna, and Gaalla.  The email chain also refers to "Cardiovascular Associates," which is the name of the CMC Cardiologists' practice group.

call list should be used only for patients who do not have a preexisting relationship with a cardiologist.  *See* Docket Entry No. 153-2 at 12–13.

As comparators, Plaintiffs offer the CMC Cardiologists, who were called when their patients needed emergency services in either the emergency room or Chest Pain Center.  They argue that the CMC Cardiologists were similarly situated because, like Plaintiffs, they were members of the medical staff, overseen by Brown, and subject to CMC's bylaws and regulations.  In response, Brown asserts that Plaintiffs and the CMC Cardiologists are not similarly situated because the CMC Cardiologists are on the on-call list.  This attempt to narrow the class of similarly situated comparators to cardiologists not on the on-call list—a class comprising only Plaintiffs—seems to put the cart before the horse because it accepts as legitimate and nonprextetual Brown's justification for his actions.  It is therefore enough to establish the prima facie case that Plaintiffs were the only cardiologists with hospital privileges who, as a result of the challenged actions, CMC no longer contacted when their patients needed emergency treatment.

Brown's explanation that Plaintiffs were excluded because they removed themselves from the on-call list in 2007 is sufficient to meet his burden of articulating a nondiscriminatory reason for his instructions to refer all emergency room and Center patients to the CMC Cardiologists, even if those patients already had a relationship with Plaintiffs.  *See Reeves,* 530 U.S. at 142 (describing the

defendant's burden as "one of production, not persuasion; it 'can involve no credibility assessment.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993))).  Brown's presentation of this nondiscriminatory rationale causes the presumption of discrimination to "drop[] out of the picture," and requires Plaintiffs to produce evidence showing that this justification is "unworthy of credence" and an attempt to mask a discriminatory motive.  *Id.* (citations and internal quotation marks omitted).

The Court finds that Plaintiffs have provided ample evidence to create a fact issue on pretext.  First, the timing of the change to the Chest Pain Center protocol is suspect.  The December 2009 amendment to the Chest Pain Center protocols occurred more than two years after the Plaintiffs' October 2007 decision to remove themselves from the on-call list.  *Compare* Docket Entry No. 131-15 *with* Docket Entry No. 153-60.  Second, while Brown's e-mail indicates the change to contact only on-call cardiologists stemmed from the need for a "prompt response," Docket Entry No. 153-60, testimony from hospital personnel indicates that Plaintiffs did not have any problems in timely responding to emergency calls.  *See, e.g.*, Docket Entry No. 153-7 at 4–5.  Third, with respect to the emergency room issue, CMC's Rules and Regulations Regarding Emergency Services require that emergency personnel make every effort to contact a patient's personal physician if requested, whether or not that physician is on the on-call list.  Docket Entry No. 153-18 ¶ 3.

Finally, although the Fifth Circuit held that Brown's written and oral statements evincing animus against Plaintiffs based on their national origin were not direct evidence of discrimination because they were not tethered to the challenged employment actions, it also recognized that "Brown's statements may serve as circumstantial evidence that his actions were motivated by racial animus." *Gaalla*, 460 F. App'x at 480; *see also Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003) (noting that "[a]fter *Reeves* . . . so long as [stray discriminatory] remarks are not the only evidence of pretext, they are probative of discriminatory intent"). Thus, considered along with the other pretext evidence discussed above, a jury could infer from Brown's statements that the actions he took to prevent Plaintiffs from being contacted when their patients needed treatment in the emergency room and Chest Pain Center were motivated not by his fidelity to the on-call list, but by his desire to "work on getting the Indians off the reservation" and concern that the Plaintiffs' demands for "leadership roles and . . . influence . . . will change the entire complexion of the hospital and create a level of fear among our employees." *Gaalla*, 460 F. App'x at 473.

> *Claim #3:   Brown entered into contracts with the non-Indian cardiology group.*

This claim asserts that Brown, on behalf of CMC, did not offer Plaintiffs the same contracts he agreed to with the non-Indian CMC Cardiologists. During 2007, the CMC Cardiologists entered into contracts, signed by Brown on behalf of CMC,

guaranteeing a base salary between $400,000 and $500,000.  Brown argues that Plaintiffs were offered the same contracts and refused them.  He cites an August 24, 2007 letter sent to Dr. Gaalla referring to a previous conversation in which Brown offered Dr. Gaalla "for the second time the same employment agreement" that was given to the CMC Cardiologists.  Docket Entry No. 174-5 at 3.  Plaintiffs have testified, however, that Brown's contract offers were a sham.  *See* Docket Entry No. 281-71 ¶ 16.

Plaintiffs' ability to establish a prima facie case on this claim thus hinges on whether they were, as they allege, treated less favorably than the CMC Cardiologists who signed contracts.  On this issue, it appears the Fifth Circuit has already spoken.  In addressing an argument from CMC Board members that the claimed contract offer to Plaintiffs negated the equal protection challenge to the Resolution, the Court of Appeals noted conflicting summary judgment evidence on whether Plaintiffs were offered the same contracts.  *Gaalla*, 460 F. App'x at 478 n.5 ("Indeed, there is summary judgment evidence that [Plaintiffs] were offered the same contracts that were offered to the contract cardiology group.  However, the summary judgment evidence also indicates that the contracts were never formally offered to [Plaintiffs] . . . .").  The law of the case doctrine precludes this Court from reconsidering the issue on remand.  *See Alpha/Omega Ins. Servs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001).  Because the

evidence is viewed in the light most favorable to Plaintiffs at the summary judgment stage, s*ee Evans*, 246 F.3d at 348 (citation omitted), the Fifth Circuit's assessment that Plaintiffs produced competent summary judgment evidence that they were not offered the same contractual terms is sufficient to raise a genuine issue of fact on the prima facie element of whether they were treated less favorably.[7]  *See Johnson v. Louisiana*, 351 F.3d 616, 621 ("[A] plaintiff must raise a genuine issue of material fact on each element of his prima facie case." (citation omitted)).

Because of his insistence that he offered Plaintiffs the same contract terms the CMC Cardiologists received, a defense that the jury of course may accept at trial, Brown does not offer any nondiscriminatory reason for an action he maintains never occurred.  Plaintiffs' establishment of a prima facie case thus ends the *McDonnell Douglas* inquiry, and this claim survives summary judgment.

> Claim #4:   *Brown removed Plaintiffs from the Chest Pain Center Committee.*

Plaintiffs allege that Brown removed them from the Chest Pain Center Committee, an interdisciplinary committee that addresses issues concerning

---

[7] Even if the Fifth Circuit language is not binding as the law of the case, Brown's letter is not comprehensive enough to overcome the contrary testimony of Dr. Parikh, though that testimony is rather conclusory.  *Compare* Docket Entry No. 174-5 *with* Docket Entry No. 281-71 ¶ 16.  The letter references a prior conversation for which no detail is provided, is addressed to and refers to conversations with only one of the Plaintiffs, and does not specify the terms of any contract offer that would allow for a comparison of whether the terms were similar to those offered to the CMC Cardiologists.

CMC's Chest Pain Center and meets approximately four times per year. Brown asserts that he never removed Plaintiffs from the Committee, but that their poor attendance and disruptive conduct would have justified such removal if it did occur.

As comparators on this claim, Plaintiffs offer several non-Indian hospital staff members who serve on the Chest Pain Center Committee. Brown does not contest that these staff members are similarly situated, but argues that they were not treated more favorably than Plaintiffs because Plaintiffs were not removed from the Committee and remain on the Committee roster. Plaintiffs' affidavits assert that they stopped receiving notices for the meetings and were no longer paged to attend them. *See* Docket Entry No. 281-71 ¶ 14. Plaintiffs have also submitted a May 2009 e-mail Brown sent to another hospital staff member stating that "[Plaintiffs] are no longer members of the committee." Docket Entry No. 153-35. This situation presents the classic "he said"/"she said" factual dispute that precludes summary judgment. Plaintiffs have presented sufficient evidence to show that they were removed from the Committee while other non-Indian staff members were allowed to remain. That satisfies their burden of establishing a prima facie case of discrimination on this claim.

Brown argues that if Plaintiffs were removed from the Committee, it was because of their lack of attendance and their disruptive conduct. Plaintiffs have

provided sufficient evidence to demonstrate that this nondiscriminatory reason is pretextual. The record shows that an altercation occurred between Dr. Taylor, one of the CMC Cardiologists, and Drs. Chandna and Parikh during a Committee meeting in January 2008. Dr. Walrod, the Committee Chair at the time, testified in his deposition that the original draft of the minutes from that meeting listed only Drs. Chandna and Parikh as being disruptive, and did not include Dr. Taylor. Docket Entry No. 153-7 at 20–22. Dr. Walrod testified that he refused to sign the minutes, despite Brown's desire to use this draft as the official minutes, until the minutes accurately reflected all of the disruptive parties. *Id.* at 21–22. Another hospital staff member testified that one of the CMC Cardiologists was disruptive at a meeting of a different committee in March 2007, but was not reported for the disruption, even though Brown reported Plaintiffs' disruptive conduct during the January 2008 meeting. *See* Docket Entry No. 153-11 at 22–23.

In terms of the absenteeism justification, while Plaintiffs had missed four of the six meetings between January 2008 and the date Brown sent his e-mail, other members also had less than stellar attendance records but were not removed. *See* Docket Entry No. 131-14 (showing that several Committee members attended no meetings during this time period and that Drs. Taylor[8] and Krueger missed two meetings during this same period). This evidence, coupled with Brown's

---

[8] Dr. Taylor's name does not appear on the 2009 list of Committee members because he was no longer working at CMC at that time. See Docket Entry No. 313 at 23:22–24:3.

previously cited general remarks showing discriminatory animus based on Plaintiffs' Indian heritage,[9] is sufficient to allow a juror to conclude that national origin discrimination was a motivating factor in Plaintiffs' removal from the Chest Pain Committee.

### B.    Claims that Do Not Survive Summary Judgment

> *Claim #1:    CMC and Brown denied Plaintiffs privileges to implant ICD Devices.*

Plaintiffs complain that Brown denied them the privilege of using Implantable Cardioverter Defibulators ("ICDs"), small devices implanted in the chest or abdomen that shock the heart to help control life-threatening arrhythmias. In deciding not to grant ICD privileges to Plaintiffs, who had such privileges at the other major Victoria hospital, CMC's Credentials Committee cited Plaintiffs' failure to meet the Committee's requirement of performing ten proctored procedures, which Plaintiffs had provisional privileges to perform. *See* Docket Entry Nos. 131-10 ¶ 5; 131-11; 131-12; 131-13.

As comparators on this claim, Plaintiffs offer two non-Indian cardiac surgeons and three of the CMC Cardiologists. But the problem for Plaintiffs is that they cannot show they were treated less favorably than these non-Indian physicians

---

[9] Brown's internal memo is particularly compelling evidence of pretext on this issue because a position on the Committee could be inferred to be the type of "leadership role" and "influence over situations that are hospital issues" that Brown was concerned would "change the entire complexion of the hospital." *See Gaalla*, 460 F. App'x at 473.

because CMC never granted anyone ICD privileges.  Docket Entry No. 131-10 ¶ 5.
Plaintiffs attempt to cite examples in which the Credentials Committee granted
these physicians other privileges, such as for stent and PTCA (a certain type of
coronary angioplasty) procedures.  But even if the similarly situated requirement is
read more broadly to allow consideration of these distinct privileges, Plaintiffs still
cannot establish a prima facie case.  Plaintiffs make mostly conclusory allegations
that these other privileges were granted to the non-Indian physicians "almost
overnight" or without meeting American College of Cardiology guidelines.
Docket Entry No. 153-30 ¶ 4.  But they are unable to show that the Committee
granted these, or any other, privileges in a case in which a physician failed to
satisfy the requirements of CMC's Credentials Committee.  This claim accordingly
fails because Plaintiffs do not show that they were treated less favorably than
similarly situated individuals.

> *Claim #6:    Brown initiated reverse investigations of Plaintiffs when
> they lodged patient care concerns.*

What Plaintiffs characterize as a "reverse investigation" involved the
following sequence of events: In mid-2009, Dr. Gaalla filed a complaint with the
Peer Review Committee about the care that Dr. Yahagi, a cardiac surgeon,
provided patient L.Z.  In response, the Committee reviewed all of the treatment
L.Z. received, including that provided by both Drs. Yahagi and Gaalla.  Docket

Entry No. 132-1 ¶ 3.   As Dr. Parma, the Chair of the Committee, notified Dr. Gaalla:

> The Peer Review Committee met this morning and considered your complaint of May 26, 2009 concerning the care of [L.Z.] and the surgery by Dr. Yahagi.   The Peer Review Committee does not agree with your accusations regarding Dr. Yahagi and, furthermore, has decided to engage outside expertise to evaluate the entire surgical and medical management of [L.Z.].

Docket Entry No. 153-55.   The Committee ultimately concluded that there was some basis to criticize Dr. Gaalla's treatment, but it took no disciplinary action against him.   Docket Entry No. 132-1 ¶ 6.

Because the Committee examined the entirety of L.Z.'s treatment in response to a complaint about one of his physicians, which Brown contends is the ordinary procedure when the Committee investigates a complaint, Plaintiffs must show that other physicians were not investigated when they made complaints even though they were involved in treating the patient.   No such evidence is in the record.   Plaintiffs cite examples in which transfers of patients to other hospitals did not trigger an investigation, *see* Docket Entry No. 388 at 9, but the undisputed evidence shows that it was Dr. Gaalla's complaint that led to the investigation at

issue.  Plaintiffs have not shown that similarly situated physicians were treated more favorably with respect to investigations, so this claim must be dismissed.[10]

> Claim #7:   Dr. Chandna was removed from the Peer Review Committee.

Dr. Chandna alleges that in July 2009, after he had served a two-year term on the Peer Review Committee, Brown removed him from the Committee.  Brown disputes the "removal" terminology, contending that instead Dr. Chandna was not reappointed, and that the refusal to reappoint was due to Dr. Chandna's poor attendance.  See Docket Entry No. 267 at 17.  The debate over semantics does not affect resolution of this claim.   Whether termed a "removal" or "failure to reappoint," the key inquiry remains whether Chandna was treated less favorably than other similarly situated members of the Committee.

Dr. Chandna fails to show that non-Indian members of the Peer Review Committee with similar attendance rates remained on the Committee.  Brown explained to Dr. Chandna that he was not considered for reappointment because of his "frequent absences during the previous year."  Docket Entry No. 153-29. Committee members are required to attend 25% of meetings each year.  Docket Entry No. 153-31.  During the year prior to Brown's decision, four Peer Review Committee meetings were held and Dr. Chandna attended none of them.  See

---

[10] Brown also argues that dismissal of this claim is warranted because there is no evidence that he had any involvement in the Committee's investigation.  The Court agrees based on a review of the record.  This provides an alternative basis for dismissal of the investigation claim.

Docket Entry No. 132-2.  Two Committee doctors with better attendance records than Dr. Chandna did not remain on the Committee.  *See id.*; Docket Entry No. 321-5.   None remaining on the Committee shared Dr. Chandna's 0% attendance record for the preceding year.  *See* Docket Entry Nos. 132-2; 321-5.  Plaintiffs therefore cannot meet their prima facie burden on this claim.  *See Lee*, 574 F.3d at 260 (explaining that comparators must have "essentially comparable violation histories" (citation omitted)).

> *Claim # 8:   Brown allowed Dr. Yahagi to refuse to provide Plaintiffs with surgical standby for a month.*

Plaintiffs complain that they were discriminated against in January 2010, just one month prior to the passage of the Resolution that lies at the heart of this case, when Brown allowed CMC's cardiac surgeon, Dr. Yahagi, to refuse to provide Plaintiffs with surgical standby.  Dr. Yahagi was the only cardiovascular surgeon on staff at CMC during this time, so Dr. Yahagi's refusal prevented Plaintiffs from performing any procedure at CMC that required a cardiac surgeon on standby.  Although the letter to Plaintiffs notifying them of this change is signed only by Dr. Yahagi, *see* Docket Entry No. 153-66,[11] deposition testimony

---

[11] In the January 14, 2010 letter, Dr. Yahagi states that "For the past many years, I have been providing standby coverage for angioplasties but have been disappointed with the inconsistency of your not referring those same patients to me when they need my services.  It seems best, I think, if I no longer provide standby coverage."  Docket Entry No. 153-66.

establishes that Brown was aware of Yahagi's decision because he assisted in drafting the letter, *see* Docket Entry No. 153-84 at 3.

Plaintiffs identify the CMC Cardiologists as suitable comparators who were treated more favorably in that they always received standby support.  But the Fifth Circuit characterized this claim as challenging Brown's act of *allowing* Dr. Yahagi to refuse to provide Plaintiffs with surgical standby, as seems necessary to tie this action to Brown.  *See Gaalla*, 460 F. App'x at 479.  In determining whether Plaintiffs have met their prima facie burden it is thus necessary for them to show that there was at least one instance in which Brown overrode a doctor's refusal to provide another doctor with surgical support.  No such evidence is in the record. Accordingly, Plaintiffs cannot establish a prima facie case and dismissal of this claim is warranted.[12]

---

[12] Even if Plaintiff's characterization of the "similarly situated, but treated less favorably" inquiry were correct, Brown has a nondiscriminatory justification because CMC regulations require cardiologists to secure their own surgical standby; Dr. Yahagi is not required to provide this service.  *See* Docket Entry No. 131-21 ¶ 13.  Plaintiffs have not identified any evidence to show that reliance on this hospital policy was pretextual, other than Brown's general comments showing discriminatory animus that alone are not sufficient to establish pretext under Fifth Circuit law. *See Palasota,* 342 F.3d at 577–78.

## IV. CONCLUSION

For the reasons detailed above, Brown's motion for summary judgment (Docket Entry No. 267) is **GRANTED IN PART AND DENIED IN PART**. [13]

The following claims against Brown withstand summary judgment under the *McDonnell Douglas* analysis and will remain in the case:

(1)    Plaintiffs' ability to receive calls when a patient presented to the emergency room was restricted.

(2)    Brown amended the protocols for the Chest Pain Center to exclude the Plaintiffs.

(3)    Brown entered into contracts with a non-Indian cardiology group.

(4)    Brown removed Plaintiffs from the Chest Pain Center Committee.

The other claims are dismissed.

**IT IS SO ORDERED.**

**SIGNED this 30th day of November, 2012.**

_____
Gregg Costa
United States District Judge

---

[13] Also pending are Plaintiffs' motions to strike portions of Brown's summary judgment evidence (Docket Entry Nos. 282 & 326). Because the Court concludes that the evidence Plaintiffs seek to strike does not alter the above *McDonnell Douglas* analysis that the Fifth Circuit directed this Court to conduct, both motions to strike are **DENIED** as moot.